# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
ROCKHILL INSURANCE COMPANY,  )
  )
Plaintiff,  )
  )
v.  )      Civil Action No. 18-2104 (ABJ)
  )
HOFFMAN-MADISON  )
WATERFRONT, LLC, *et al.*,  )
  )
Defendant.  )
_____)

## MEMORANDUM OPINION

On September 10, 2018, plaintiff Rockhill Insurance Company ("Rockhill") brought this suit concerning the interpretation of a commercial general liability policy. Plaintiff seeks a declaration that it does not owe a duty under the policy to defend or indemnify, Wharf Horizontal REIT Leaseholder, LLC ("WHRL"), or a number of affiliated entities, Hoffman-Madison Waterfront, LLC ("HMW"), Hoffman-Struever Waterfront, LLC ("HSW"), Wharf District GP Joint Venture, LLC ("WDGPJV"), Wharf District Joint Venture, LLC ("WDJV"), Wharf Horizontal REIT, LLC ("WHR"), and Wharf Fish Market REIT Leaseholder, LLC ("Fish Market REIT") (collectively, "developer defendants"), in a civil suit brought against the developer defendants by commercial tenants located in the Southwest Waterfront area in the District of Columbia. Compl. [Dkt. # 1] ¶ 1, 12. The underlying suit was filed in United States District Court for the District of Columbia and is captioned, *The Wharf, Inc., et al. v. The District of Columbia, et al.*, 1:15-CV-01198-CKK (2015) ("Wharf Suit"). *Id.*

Plaintiff Rockhill's complaint raises three claims:

- Count I alleges that under the insurance policy, Rockhill "does not owe a duty to defend or indemnify" the developer defendants in the underlying suit, and it

seeks "recoupment of attorneys' fees, costs, and expenses paid by Rockhill in defense of the Wharf Suit." Compl. ¶ 77.

- Count II pleads in the alternative, that Rockhill is equitably "entitled to recover . . . defense costs that are incurred in connection with non-covered claims and issues." *Id.* ¶ 79.

- Count III alleges that Rockhill has no duty to defend or indemnify individual defendant Fish Market REIT because it is not an "'insured under the Rockhill Policy with respect to its own conduct, or the conduct of any 'insured' under the Rockhill Policy, with respect to the Wharf Suit," *id.* ¶ 83. It seeks reimbursement of at least 50% of all defense costs incurred since Fish Market REIT joined the Wharf Suit in February 2017, and contends that moving forward, Fish Market REIT must share in defense costs or retain separate defense counsel. *Id.* ¶¶ 85–88.

Defendants filed an answer and counterclaim on November 16, 2018. Developer Defs.' Answer to Rockhill's Compl. & Countercl. [Dkt. # 17] ("Defs.' Answer" or "Countercl."). They raise three counts in their counterclaim:

- Count I alleges that Rockhill entered into a subsequent separate "binding and enforceable contract" with defendants in December 2015 ("December 2015 Agreement"), Countercl. ¶ 76, and that Rockhill breached the terms of that agreement by refusing to pay certain defense costs incurred in the underlying suit, *id.* ¶¶ 79–80, and "by attempting to control the defense." *Id.* ¶ 81.

- Count II pleads that Rockhill breached its duty to defend the developer defendants under the terms of the insurance policy by refusing to pay for certain costs incurred in the underlying suit, demanding developer defendants allocate costs between what Rockhill believes are covered and non-covered claims, and by delaying payment of defense costs owed. Countercl. ¶¶ 85–89.

- Count III alleges that Rockhill breached the implied covenant of good faith and fair dealing arising under both the Policy and the December 2015 Agreement. Countercl. ¶¶ 91–96.

Now pending before the Court is plaintiff Rockhill's motion for judgment on the pleadings with respect to Counts I and III of its complaint and Counts I, II, and III of developer defendants' counterclaim. Rockhill's Mot. for J. on the Pleadings [Dkt. # 24] ("Pl.'s Mot."); Mem. of P. & A. in Supp. of Pl.'s Mot. [Dkt. # 24-1] ("Pl.'s Mem."). The developer defendants opposed that motion, and cross-moved for judgment on the pleadings on Count I of Rockhill's

complaint. Developers' Cross-Rule 12(c) Mot. for J. on Count I of Rockhill's Compl. [Dkt. # 25] ("Defs.' Cross-Mot."); Developers' Consolidated Brief in Opp. to Pl.'s Mot. & in Supp. of Cross-Mot. [Dkt. # 25-1] ("Defs.' Cross-Mem."). They did not cross-move on any of the other counts in Rockhill's complaint, or in their counterclaim. *Id.* The issues have been fully briefed and are ripe for decision.[1] For the reasons stated below, plaintiff's motion for judgment on the pleadings is denied in part and granted in part, and defendants' motion is granted in part and denied in part. The Court finds that Rockhill owes a duty to defend under the insurance policy WHRL, HMW, HSW, WDGPJV, WDJV, and WHR. Rockhill does not owe a duty to defend Fish Market REIT under the policy. As to the December 2015 Agreement, the Court finds that there remain questions of fact so judgment on the pleadings is not appropriate.

## BACKGROUND

### I. Factual Background

On April 23, 2014, the District of Columbia assigned its landlord rights and duties on several commercial barges located at the Municipal Fish Market on the District of Columbia's Southwest Waterfront to defendant WHRL. Compl. ¶ 2; Defs.' Answer ¶ 2. That same day, WHRL purchased a "Lessor's Risk" commercial liability insurance policy insuring the Municipal Fish Market located at 1100 Maine Avenue, S.W., Washington D.C. 20024. Compl. ¶ 3; Defs.' Answer ¶ 3; Ex. I to Compl. [Dkt. # 1-10] (the "Policy") at RHIC000009.[2] The tenants of the insured property operate three seafood businesses at the Municipal Fish Market. Compl. ¶ 1; Defs.' Answer ¶ 1.

---

[1] *See also* Rockhill's Consolidated Reply in Supp. of its Mot. & Resp. in Opp. to Defs.' Cross-Mot. [Dkt. # 29] ("Pl.'s Reply"); Developers' Reply in Further Supp. of Cross-Mot. [Dkt. # 30] ("Cross-Reply").

[2] The Policy was renewed on April 23, 2015. Ex. B to Defs.' Cross-Mot. [Dkt. # 25-3] at 1. This extended the Policy's coverage until April 23, 2016. *Id.*

On July 23, 2015 those tenants sued WHRL and HMW, alleging that the defendants' major redevelopment project along the Southwest Waterfront disrupted their businesses and breached their lease agreements, and they brought a number of tort claims arising out of the defendants' actions, including trespass and nuisance violations, among other claims.[3]  Ex. A to Pl.'s Compl. [Dkt. # 1-2] ("Wharf Compl.") ¶¶ 229–73.

On July 29, 2015, a few days after the Wharf Suit was filed, defendants HMW and WHRL tendered their defense to Rockhill pursuant to the commercial general liability policy. Countercl. ¶ 14; Rockhill's Answer & Affirmative Defenses to the Developer Defs.' Countercl. [Dkt. # 20] ("Rockhill Answer") ¶ 14.  Rockhill disclaimed the duty to defend them in the Wharf Suit and rejected their tender.  Countercl. ¶ 15; Rockhill Answer ¶ 15.  Defendants HMW and WHRL asked the insurance company to reconsider its position in a letter dated September 11, 2015.  Countercl. ¶ 16; Rockhill Answer ¶ 16.  Specifically, defendants asked that Rockhill provide a defense under "Coverage B" of the Policy.  Countercl. ¶ 16; Rockhill Answer ¶ 16

Rockhill agreed.  On or about October 9, 2015, Rockhill sent a letter to defendants HMW and WHRL in which it agreed to defend them in the Wharf Suit pursuant to a reservation of rights.  Ex. E to Compl. [Dkt. # 1-6] ("Oct. 9, 2015 Rockhill Letter").  The letter provided in relevant part:

> Rockhill's continued handling of this matter is not an admission of any kind on the part of Rockhill. No act by a Rockhill representative while investigating, negotiating a settlement of the claim, or defending the Lawsuit should be construed as waiving any company rights. Rockhill reserves its rights under the Policy to deny coverage to HMW, WHRL, or anyone else claiming coverage under this policy.

---

3    The Wharf, Inc., BRW, Inc, and Salt Water Seafood, Inc. are the underlying plaintiffs in the Wharf Suit.  *See* Wharf Compl.

*Id.* at 2. The letter further explained that "based on the facts as we understand them, coverage is uncertain right now or may be significantly limited," *id.*, and that "[a]fter careful review" the insurance company believed that "only the 'personal advertising offense' relative to 'wrongful eviction from, wrong entry into, or the invasion of the right of private occupancy' [was] implicated" under Coverage B. *Id.* at 7. The letter also informed HMW and WHRL that the insurance company had retained the law firm of Leder & Hale, PC to represent them in the Wharf Suit. *Id.* at 2.

Shortly thereafter, Rockhill adjustor Leslie Bowles, who was assigned to the claim, participated on a conference call with defendants' counsel, Pillsbury, who had been representing HMW and WHRL in the Wharf Suit. Countercl. ¶ 20; Rockhill Answer ¶ 20. The parties dispute what happened on the call. According to defendants, Bowles and the Pillsbury attorneys negotiated the terms of a new agreement by which defendants would be allowed to proceed with their counsel of choice, Pillsbury, but the insurance company would pay past and future defense costs at the lower *Laffey* rates. Countercl. ¶ 23. Defendants allege that under this agreement "Rockhill would fund the entirety of the defense of the Wharf Suit," *Id.* ¶ 24, "without any reservation of rights regarding the duty to defend." *Id.* ¶ 1. According to defendants, the new agreement was "memorializ[ed]" in a December 1, 2015 email exchange between Bowles and a Pillsbury attorney. *Id.* ¶ 1 n.1; Ex. A to Defs.' Countercl. [Dkt. # 17-1] ("December 2015 Agreement").

Rockhill insists that "[a]t no point did Rockhill or the developer defendants discuss or agree that the reservations pursuant to which the defense was provided would be altered, withdrawn, or otherwise waived." Rockhill Answer ¶ 23. But it acknowledges that it did agree

"that the defense provided under the reservation of rights could be provided through [defendants'] choice of counsel at agreed-upon rates." *Id.*

In February 2016, Pillsbury sent Rockhill invoices for defense costs incurred between July 2015 through December 2015 at *Laffey* Matrix rates, and Rockhill paid those invoices in full. Countercl. ¶ 29; Rockhill Answer ¶ 29.

Defendant WHRL filed a counterclaim in the Wharf Suit on March 29, 2016, Compl. ¶ 33; Defs.' Answer ¶ 33, and on May 9, 2016, it amended its counterclaim, alleging that the commercial tenants breached their leases and that as their landlord, it is entitled to evict them. Compl. ¶ 35; Defs.' Answer ¶ 35; Ex. D to Compl. [Dkt. # 1-5].

Pillsbury continued to send invoices to Rockhill, but the insurance company began raising concern about the costs of pursuing counterclaims in the Wharf Suit, and it deducted certain amounts from invoices during the billing period of May 2016 through October 2016. Countercl. ¶¶ 31–32; Rockhill Answer ¶¶ 31–32.

While the Wharf Suit was underway, on or about October 31, 2016, defendant WHRL assigned its interest in the commercial leases to a separate entity, defendant Fish Market REIT. Compl. ¶ 36, Defs.' Answer ¶ 36. WHRL then moved to join the new landlord of the leases, Fish Market REIT, in the Wharf Suit as a defendant and counterclaim plaintiff, and that motion was granted on February 12, 2017 by the district court. Compl. ¶ 37; Defs.' Answer ¶ 37.

On February 27, 2017, days after Fish Market REIT joined the suit, Rockhill's counsel sent a letter to defendants "supplement[ing]" its initial October 9, 2015 letter. Ex. F to Compl. [Dkt. # 1-7] ("Feb. 27, 2017 Rockhill Letter") at 1. In the letter, Rockhill listed a number of issues raised in the Wharf Suit that in its view were not covered by the Policy and it advanced several proposals to limit or terminate the insurance company's funding of the litigation,

including an "equitable allocation of future defense costs between covered and non-covered claims" or a "policy buy-back." *Id.* at 2–3. Rockhill expressed a desire to work with defendants to find a resolution to the dispute, but it informed them that if no accord was reached, court proceeding may be necessary. *Id.* at 3.

The supplemental letter included a "coverage analysis" explaining why the plaintiffs' claims in the Wharf Suit were "likely" outside of the policy's coverage, *id.* at 6–8, and why the policy did not cover the costs of prosecuting counterclaims. *Id.* at 8–9. The letter also stressed that the newly-added defendant, Fish Market REIT, did not qualify as an insured. *Id.* at 8. The supplemental letter repeated the insurance company's reservation of rights: "Nothing in this letter should be construed as waiving any defenses raised in Rockhill's initial letter or otherwise." *Id.* at 6.

Three of the defendants, HMW, WHRL, and Fish Market REIT, responded by letter on April 22, 2017, contending that Rockhill owed them a duty to defend against the entire Wharf Suit under both the Policy and the separate December 2015 Agreement. Ex C. to Defs.' Cross-Mot. [Dkt. # 25-4] ("April 22, 2017 Defs.' Letter") at 1–8. In the letter, they also acknowledged that Fish Market REIT is not an insured under the Policy: "You correctly point out that Wharf Fish Market REIT Leaseholder ("WFMRL") is not [Rockhill's] insured." *Id*. at 6. But they took the position that Rockhill "cannot escape responsibility for defense costs on the ground that some defense work also benefits entities that are not insured of the developer defendants' counterclaim." *Id.* at 7.

On April 26, 2017, the underlying plaintiffs filed a Second Amended Complaint in the Wharf Suit, naming other affiliates of HMW, WHRL, and Fish Market REIT – that is, WDGPJV, WHR, HSW, and WDJV, as additional defendants. Compl. at ¶ 38; Defs.' Answer ¶

38.  The Third Amended Complaint, which is now the operative complaint in the Wharf Suit, followed in September 2017.  Compl at ¶ 39; Defs.' Answer ¶ 39.

The Third Amended Complaint alleges that in April 2014 the District assigned its rights as landlord to WHRL, an alter ego of HMW.  Wharf Compl. ¶¶ 8, 61.  The underlying plaintiffs claim that "[u]nder the terms of each lease, [they] are entitled to exclusive use of certain water frontages to operate open air fish markets and a seafood deli," and that they "also have the right to access and use the Common Area."  *Id.* ¶ 106.  The Common Area is "designated for general use, convenience, and benefit of the commercial tenants in the area and their customers on the Municipal Fish Market (*e.g.* restrooms, parking areas, driveways, walkways, loading and unloading for deliveries)."  *Id.* ¶ 47.

The underlying plaintiffs allege, among other things, that the developer defendants breached the terms of their leases through repeated unauthorized encroachments onto the Municipal Fish Market, Wharf Compl. ¶ 248, and that developer defendants violated their property rights through trespass and nuisance violations.  *See id.* ¶¶ 263, 268 (alleging defendants "wrongfully excercis[ed] ownership, dominion, and control over portions of the Municipal Fish Market," and that defendants' activities have interfered with plaintiffs' "private use and enjoyment of their leased property").

Rockhill followed up with two letters to Fish Market REIT dated January 15, 2018 and February 16, 2018, demanding that it contribute 50% of defense costs incurred since it joined the Wharf Suit on February 13, 2017.  Ex. G to Compl. [Dkt. # 1-8] ("January 15, 2018 Rockhill Letter"); Ex. H to Compl. [Dkt. # 1-9] ("February 16, 2018 Rockhill Letter").  The letter states that if no agreement is reached, "Rockhill reserves its right to request court allocation as to the

equitable distribution of defense costs, fees, and expenses." January 15, 2018 Rockhill Letter at 2.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) authorizes a party to move for judgment on the pleadings at any time "after the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). Pleadings include any "copy of a written instrument that is an exhibit to a pleading." Fed. R. Civ. P. 10(c). Here, the parties have attached to their pleadings copies of their correspondence, the insurance policies, the purported December 2015 Agreement, and the Third Amended Complaint in the underlying suit, among other documents. *See* Exs. A–J to Compl. [Dkt. # 1-2 to 1-11]; Ex. A to Countercl. [Dkt. # 17-1]; Exs. B–C to Defs.' Cross-Mot. [Dkt. # 25-3 to 25-4]. For the purpose of resolving the pending motions, the Court may only consider the contents of the pleadings.[4]

As the D.C. Circuit recently observed, "judgment on the pleading is rare," and because it "provides judicial resolution at an early stage of a case, the party seeking . . . [it] shoulders a heavy burden of justification." *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n, AFL-CIO v. Liberty Mar. Corp.,* 933 F.3d 751, 760 (D.C. Cir. 2019) ("*Liberty Mar.*"). Parties are entitled to pretrial judgment on the pleadings "if the moving party demonstrates that no material fact is in dispute and that it is entitled to judgment as a matter of law." *Schuler v. PricewaterhouseCoopers, LLP*, 514 F.3d 1365, 1370 (D.C. Cir. 2008), quoting *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992). When analyzing a motion for judgment on the pleadings, the Court must "accept as true the allegations in the opponent's

---

4       If the court considers "matters outside of the pleadings . . . the motion must be treated as one for summary judgment under Rule 56," after giving the parties a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

pleadings, and as false all controverted assertions of the movant." *Liberty Mar.*, 933 F.3d at 761, quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987) (collecting cases), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006). The Court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Peters*, 966 F.2d at 1485, quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988). "Under this standard, 'a judgment on the pleadings is not appropriate' if there are 'issues of fact which if proved would defeat recovery,' 'even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial.'" *Liberty Mar.,* 933 F.3d at 761, quoting *Wager v. Pro*, 575 F.2d 882, 884 (D.C. Cir. 1976).

## ANALYSIS

### Choice of Law

Both parties presume that District of Columbia of law applies. That presumption is correct for two reasons. District of Columbia law is appropriate in this case because the place of performance and the insured risk is in the District of Columbia. *Adolph Coors Co. v. Truck Ins. Exch.,* 960 A.2d 617, 620 (D.C. 2008). Additionally, insurance law dictates that courts interpret the allegations in an underlying lawsuit based on where the suit was filed. *Travelers Indem. Co. of Illinois v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 988 (D.C. 2001) ("*Travelers"*) (applying District of Columbia law to interpret the insurance contract but not the allegations in the underlying suit which was filed in South Carolina). Therefore, the Court will interpret both the insurance policy and the underlying lawsuit under District of Columbia law.

**Construction of Insurance Contracts & Duty to Defend**

In the District of Columbia, "[a]n insurance policy is a contract between the insured and the insurer, and in construing it [a court] must first look to the language of the contract." *Travelers*, 770 A.2d at 986, quoting *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999). When interpreting an insurance contract, the Court must construe "ambiguities . . . against the insurer and in favor of 'the reasonable expectations of the purchaser of the policy.'" *Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1127 (D.C. 2001), *Smalls v. State Farm Mut. Auto. Ins. Co.*, 678 A.2d 32, 35 (D.C. 1996). Under this principle, if a Court finds that a term "is reasonably open to two constructions, the one most favorable to the insured will be adopted." *Id*. However, an insurance contract is not "ambiguous merely because the parties do not agree on the interpretation of the contract provision in question." *Byrd v. Allstate Ins. Co.*, 622 A.2d 691, 695–94 (D.C. 1993). The D.C. Court of Appeals has held that "[p]olicy language is not genuinely ambiguous unless it is susceptible of more than one *reasonable* interpretation," and it has instructed courts not to "indulge in forced constructions to create an obligation against the insurer." *Chase*, 780 A.2d at 1127–28 (emphasis in original) (internal citation omitted).

The duty to defend is determined by comparing the allegations in the underlying complaint against the terms of the insurance policy. *Cont'l Cas. Co. v. Cole*, 809 F.2d 891, 896 (D.C. Cir. 1987). This is referred to the as the "eight corners rule." *Fogg v. Fidelity Nat'l Title Ins. Co.*, 89 A.3d 510, 515 (D.C. 2014) ("[O]ur jurisdiction, like the majority of jurisdictions, adheres to the 'eight corners rule.'"). Under District of Columbia law:

> If the [underlying] complaint states a cause of action within the coverage of the policy, the insurance company must defend. Any doubt as to whether the cause of action falls within the terms of the policy must be resolved in the insured's favor.

*Cont'l Cas.*, 809 F.2d at 895, citing *Boyle v. National Casualty Co.*, 84 A.2d 614, 615–16 (D.C. 1951).

"An insurer's duty to defend is conceptually distinct from and legally independent of its duty to indemnify, that is, its obligation to pay a judgment." *Salus Corp. v. Cont'l Cas. Co.*, 478 A.2d 1067, 1069 (D.C. 1984); *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 67 (D.C. 2002). "The duty to defend is broad, requiring the defense of all claims even if only one potentially falls within the terms of the policy." *Council For Responsible Nutrition v. Hartford Cas. Ins. Co.*, No. 06-cv-1590, 2007 WL 2020093, at *3 (D.D.C. July 12, 2007), citing *Cont'l Cas.*, 809 F.2d at 895; *see also Commonwealth Lloyds Ins. Co. v. Marshall, Neil & Pauley, Inc., 32 F. Supp. 2d 14, 18 (D.D.C. 1998)* (collecting cases). Also, while the duty to defend depends only on allegations in the complaint, the duty to indemnify depends upon the truth of those allegations. *S. Freedman & Sons, Inc. v. Hartford Fire Ins. Co., 396 A.2d 195, 197 (D.C. 1978)*. Accordingly, "if the allegations of a plaintiff's complaint may bring the claim within the coverage of the defendant's policy, the insurance company must honor its duty to defend, even if ultimately relieved of any duty to indemnify." *Sherman v. Ambassador Ins. Co.*, 670 F.2d 251, 259 (D.C. Cir. 1981). "[I]t is appropriate to examine the complaint for all plausible claims encompassed within the complaint and to ascertain whether the allegations of the complaint state a cause of action within the policy coverage and give fair notice to the insurer that the insured is being sued upon an occurrence which gives rise to a duty to defend under the terms of the policy." *Am. Cont'l Ins. Co. v. Pooya,* 666 A.2d 1193, 1197 (D.C. 1995).

At this stage, the Court has been called upon only to determine the duty to defend.

## I. ROCKHILL'S COMPLAINT

### a. Count I

Rockhill alleges in Count I of its complaint that it "does not owe a duty to defend or indemnify the developers," under the terms of the Policy, and that it is "entitled to recoupment of attorneys' fees, costs, and expenses paid by Rockhill in defense of the Wharf Suit." Compl. ¶ 77. Both Rockhill and defendants moved for judgment on the pleadings related to (1) the duty to defend and (2) recoupment. Pl.'s Mem. at 3; Defs.' Cross-Mem. at 39. For the reasons that follow, the Court finds that Rockhill owes the insured defendants, WHRL, HMW, HSW, WDGPJV, WDJV, and WHR, a duty to defend under the Policy, and that it is not entitled to the recoupment of defense costs from the insured defendants. This ruling does not apply to Fish Market REIT, which the Court finds is not insured under the Policy. *See* Section I, b ("Count III").

#### i. *Duty to Defend: Coverage B, Personal and Advertising Injury Liability*

The insured bears the burden of showing that the underlying complaint comes within the policy's grant of coverage, and the insurer bears the burden of showing that an exclusion under the policy applies. *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 969 (D.C. 1999).

In their cross-motion, defendants contend that the trespass (Count VIII), nuisance (Count IX), tortious interference with prospective business advantage (Count X), and unjust enrichment claims (Count XI), fall within the scope of the Policy's Coverage B. Defs.' Cross-Mem. at 39.

The provision in the Policy entitled "Coverage B Personal and Advertising Injury Liability" provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

Policy at RHIC000029.

The "Definitions" section of the Policy defines "personal and advertising injury" as "injury, including consequential 'bodily injury,' arising out of one or more of the following offenses"

> a. False arrest, detention or imprisonment;
>
> b. Malicious prosecution;
>
> c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>
> d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;
>
> e. Oral or written publication, in any manner, of material that violates a person's right of privacy;
>
> f. The use of another's advertising idea in your "advertisement"; or
>
> g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

Policy at RHIC000038.

Defendants contend that the allegations in the Wharf Suit implicate subsection (c) because the trespass, nuisance, tortious interference, and unjust enrichment counts "are all focused upon the [the underlying plaintiffs'] allegation that the Developers encroached upon their possessory interests under the alleged leases, and have deprived them of their right to quiet enjoyment of their alleged leasehold interests." Defs.' Cross-Mem. at 39.

Since the Wharf Suit does not allege a "wrongful eviction," the Court finds that the potentially applicable offenses under subsection (c) are: "wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by

or on behalf of its owner, landlord or lessor."[5]  Policy at RHIC000038.  The term "wrongful

entry into," "guarantee[s] tenants that their rights of physical possession will not be violated."

*Beltway Mgmt. Co. v. Lexington-Landmark Ins. Co.,* 746 F. Supp. 1145, 1150 (D.D.C. 1990).

The phrase "invasion of the right of private occupancy" has been interpreted by courts to cover a

"broad range" of claims "arising from a landlord's deprivation of a tenant's rights," including the

warranty of habitability, which ensures that that the leased premises are fit for use.  *Id.* at 1153–

54 (D.D.C. 1990) (collecting cases).

 The Court finds that the trespass count in the Wharf Suit, Count VIII, contains allegations

that potentially "aris[e]" from the "wrongful entry into, or invasion of the right of private

occupancy."  Policy at RHIC000038.  The trespass count alleges that defendants violated the

underlying plaintiffs' "possessory interest" in their designated lots and the Common Area of the

Municipal Fish Market by blocking entrances to and from the Municipal Fish Market, blocking

access to plaintiffs' electricity panel, blocking access to dumpsters which created a "health and

safety issue," and by impeding deliveries from vendors, among other acts.  Wharf Compl. ¶ 262.

The underlying plaintiffs claim that "these encroachments resulted in [d]eveloper [d]efendants

wrongfully exercising ownership, dominion, and control over portions of the Municipal Fish

Market."  *Id.* ¶ 263.  Therefore, the trespass count squarely falls within the scope of Coverage B,

and the Court need not go any further in addressing the other counts because under District of

Columbia law simply finding that one claim in the underlying suit "potentially falls within the

policy" is sufficient to give rise to a duty to defend against all claims.  *Council for Responsible

Nutrition*, 2007 WL 2020093, at *3.

---

5 The complaint alleges that defendants "attempt[ed]" to evict the underlying plaintiffs.
Wharf Compl. ¶¶ 11, 159.  But that is not the same as actual wrongful eviction so this offense is
not implicated.

For the reasons stated, the Court finds that the insured defendants have met their burden of showing that the underlying complaint comes within the policy's grant of coverage, and now Rockhill bears the burden of showing that an exclusion under the Policy applies.

ii.    *Lessor's Risk*

The business description on the declarations page of the Policy is "Lessor's Risk." Policy at RHIC000005. Rockhill contends that this is in effect a limiting term, and the Policy "covers risks commonly associated with a landlord's premises," not "disputes over a multi-billion-dollar development" project. Pl.'s Mem. at 14. The insurer emphasizes the fact that the defendants' "$2-billion redevelopment project" is not mentioned in the Policy, and it argues that the Policy was meant to cover the insureds in their capacity as landlords, not developers. Pl.'s Mem. 14–17; Pl.'s Reply at 8. Defendants insist that the Wharf Suit falls within "Lessor's Risk" insurance because it is a dispute between landlords and their tenants over premises covered by the Policy. Cross-Mem. at 20. Defendants distinguish the Wharf Suit from a "construction" suit in which a plaintiff seeks damages for a defectively constructed structure. *Id.*

The Court finds that coverage must be determined in accordance with the express terms of the Policy, which do not include the limiting principles the insurer invokes here. The Policy provides "commercial general liability coverage," with specifically identified exclusions, none of which supply the limitation Rockhill would have the Court read into the document. It is undisputed that the Municipal Fish Market (1100 Maine Ave., S.W.), is listed as an insured property in the Policy's "Location Schedule." Policy at RHIC000009. And, the Policy's "Limitation of Coverage to Designated Premises or Project" does not enumerate "commonly associated risks," as plaintiff suggests. *See* Policy at RHIC000056. Instead, it broadly provides that:

> This insurance applies only to "bodily injury", "property damage", "personal and advertising injury" and medical expenses arising out of:
> The ownership, maintenance or use of the premises shown in the Schedule and operations necessary or incidental to those premises . . .[6]

*Id.* Here, the claims of "personal and advertising injury," as the term is defined in the Policy, arise out of defendants' "ownership, maintenance or use of the premises" shown in the Location Schedule. *See* Wharf Compl. ¶¶ 262, 269 (alleging defendants blocked an entrance to the Municipal Fish Market, blocked or altered pedestrian foot traffic, sectioned off portions of the parking lot).

Indeed, the Wharf Suit is at its core a landlord-tenant dispute, so there is no inconsistency between the designation "Lessor's Risk" on the first page of the Policy, and the claims raised in the litigation. *See* Wharf Compl. ¶¶ 1 n.1, 142–58 (referring to defendants as the "landlord" and alleging that defendants violated their property rights under their leases through a series of unauthorized encroachments that caused them harm and disrupted their businesses).

### iii. *"Persons" under Coverage B's Personal and Advertising provisions*

Next, Rockhill argues that the Wharf Suit does not involve a "personal and advertising" injury because the underlying plaintiffs are not natural persons, but rather corporations. Pl.'s Mem. at 17–20. It notes that subsection (c) of the definitions of "personal and advertising injury" covered by the Policy applies to "premises that *a person* occupies." *Id.* at 17, citing Policy at RHIC000029–30, 38 (emphasis added), and that the policy consistently distinguishes between "persons" and "organizations." Pl.'s Mem. at 19; Pls.' Reply at 12. For example, subsection (d) of the definition of "personal and advertising injury" references "material that

---

6    The Policy would also cover "'bodily injury,' 'property damage,' 'personal and advertising injury' and medical expenses arising out of . . . [t]he project show in the Schedule," Policy at RHIC000056, but there is no "project" identified in this policy.

slanders or libels a person or organization or disparages a person's or organization's goods, products, or services." Policy at RHIC000038.

Defendants insist that courts have long considered corporations to be "persons" under the law, and that a contrary conclusion would render Rockhill's insurance coverage illusory. Cross-Mem. at 22–28. They posit that the phrase "persons or organizations" is simply meant to capture entities that are not recognized as "persons" under the law, meaning entities that are neither natural persons nor corporations. *Id.* at 23.

The Policy does not define the term "person." Under District of Columbia law, the Court must give an undefined insurance policy term "the meaning which common speech imports," unless it is "obvious" that the terms are "intended to be used in a technical connotation." *In re Estate of Corriea*, 719 A.2d 1234, 1239 (D.C. 1998). The Court must "determine what a reasonable person in the position of the parties would have thought the disputed language meant." *Interstate Fire & Cas. Co. v. Washington Hosp. Ctr. Corp.*, 758 F.3d 378, 383 (D.C. Cir. 2014), quoting *Travelers*, 770 A.2d at 986. "In conducting that inquiry, District of Columbia courts routinely consult dictionary definitions of disputed terms." *Id.*

In *Interstate Fire & Casualty Company,* the D.C. Circuit relied upon the *American Heritage Dictionary* and *Black's Law Dictionary* to interpret the term "employee." *Id.* at 384. It found "*Black's Law [Dictionary]* to be helpful in construing insurance policies under District of Columbia law," and it observed that, "District of Columbia courts routinely rely on *Black's Law* definitions in the insurance context." *Id.* at 384 (collecting cases). Thus, the Court will consult both sources here.

According to *Black's Law Dictionary*, the term "person" is defined as 1) a "human being . . . also termed natural person"; 2) "the living body of a human being"; and 3) an "entity (such

as a corporation) that is recognized by law as having most of the rights and duties of a human being." *Black's Law Dictionary* (11th ed. 2019). The *American Heritage Dictionary* also defines a "person" as a "corporation" in the "law" context. *American Heritage Dictionary* (5th ed. 2019).

That is unsurprising given the long history of courts recognizing corporations as persons under the law. *See Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. 518 (1819) (describing corporations as artificial persons protected under the Contract Clause of the Constitution); *United States v. Amedy*, 24 U.S. 392, 412 (1826) (holding that the term "person" in insurance fraud statute includes artificial persons like corporations); *Clinton v. City of New York*, 524 U.S. 417, 454 (1998), citing 1 U.S.C. § 1 (explaining "insofar as the word is concerned, Congress speaks English like the rest of us:" and has defined "person" to "include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals"); *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 452–55 (2012) (holding that the term "person" can include both an individual or  artificial entities like corporations and therefore, use of the term "individual" in the Trafficking Victims Protection Act was intended to specify a natural person); s*ee also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 391–92 (2010) (individual person's right to free speech under the First Amendment includes the right to speak in association with other individual persons in a business corporation).

The Court acknowledges that some ambiguity arises out of the use of the term "person" in subparagraphs "c" and "e" of the definitions of "personal and advertising injury," particularly given that the same section uses the phrase "person or organization" in subparagraph "d," and the word "another" in subparagraphs "f' and "g." Policy at RHIC000038. It is fair to suggest that considering the section as a whole, this distinction could give rise to an inference that

subparagraph "c" was meant to refer to the type of harm that only a natural person would suffer, as in subparagraphs a, b, and e, and that this is further supported by the name of the coverage category: "*personal* and advertising injury." *Id.* (emphasis added).

But in light of the clear precedent that requires a court to interpret ambiguous language in favor of the insured, *see Quadrangle Dev. Corp. v. Hartford Ins. Co.*, 645 A.2d 1074, 1075 (D.C. 1994) (citation omitted) ("If there are a number of reasonable readings of a policy provision, the insured is entitled to the one favoring coverage."), Rockhill's interpretation of the language cannot prevail, particularly since both sides were well aware that this was a commercial policy. But again, this Court is not ruling on the ultimate indemnification obligation; only if the claims on their face potentially fall within the Policy. Consequently, the Court concludes that when defendants purchased the Policy, they reasonably believed that the term "person" applied to their corporate tenants.[7] The Court finds that the underlying corporate plaintiffs are "persons" under the Policy's "personal and advertising" provision.

    *iv.    The Breach of Contract Exclusion*

Plaintiff Rockhill contends that the "breach of contract" exclusion applies to the trespass, conversion, nuisance, unjust enrichment, and tortious interference claims in the Wharf Lawsuit because they arise "indirectly" from the breach of a contract. Pl.'s Mem. at 20–23.[8] Defendants argue that "personal and advertising" liability "clearly contemplates coverage for the wrongful eviction of a tenant by a landlord, even though such an action by its nature has its roots in

---

7    Plaintiff Rockhill cites *Athridge v. Aetna Cas. & Sur. Co.*, 351 F.3d 1166, 1172 (D.C. Cir. 2003) for the proposition that the term "person" in the insurance context means natural persons, not business entities. Pl.'s Mem. at 17. But that mischaracterizes the holding. In that case the Court held that the term "any person" encompassed the phrase "family member;" it did not address whether it also included a corporation.

8    Defendants do not dispute that this exclusion applies to the contract counts in the Wharf Suit. *See generally* Cross-Mem.

contract." Defs.' Cross-Mem. at 29, citing *Brown v. Travelers Aetna Prop. Cas. Cop.*, 187 F.3d 646 (9th Cir. 1999). The Court agrees with defendants with respect to the trespass claim and it need not go further.

The Policy's "Breach of Contract Exclusion" reads as follows:

> This insurance does not apply, nor do we have a duty to defend any claim or "suit" for "bodily injury", "property damage" or "personal and advertising injury" *arising* directly or *indirectly out of* the following:
>
> a. Breach of express or implied contract;
>
> b. Breach of express or implied warranty; [or]
>
> c. Fraud or misrepresentation regarding the formation, terms or performance of a contract . . .

Policy at RHIC000023 (emphasis added).

Rockhill argues that the phrase "arising . . . indirectly out of" should be broadly construed to exclude all of the tort claims, because the damages sought are necessarily predicated on the breach of lease agreements, which are a type of contract. Pl.'s Mem. at 22. But if the Court were to accept that interpretation, it would render subsection (c) of the coverage for personal and advertising injury to be meaningless.

When interpreting the terms of an insurance contract, the Court must consider "the reasonable expectations of the purchaser of the policy." *Chase*, 780 A.2d at 1127. Defendants reasonably believed that the policy covered personal and advertising liability that arose indirectly from a lease since subsection (c) specifically includes "wrongful eviction," and the "invasion of the right of private occupancy" committed by a "landlord or lessor." Policy at RHIC000038. Plus, the insured's business description on the first page of the Policy is "Lessor's Risk." *Id.* at RHIC000005. For these reasons, the Court will decline to apply an exclusion that would make coverage illusory. *See Caglioti v. Dist. Hosp. Partners, Lp*, 933 A.2d 800, 811 (D.C. 2007), citing *Retail Clerks Int'l Ass'n Local No. 455, AFL-CIO v. N. L. R. B.*, 510 F.2d 802, 806 (D.C.

Cir. 1975) ("It is a settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless.").

     *v.*    *The "Knowing and Intentional" Exclusion*

     Next, plaintiff Rockhill argues that "each of the underlying plaintiffs' claims is premised on non-covered intentional misconduct." Pl.'s Mem. at 23. Coverage B specifically excludes:

> "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

Policy at RHIC000030. The parties agree that under this exclusion, it is not enough for conduct to be intentional, it must have been committed knowing that it violated a property right. Defs.' Cross-Mem. at 31–32; Pl.'s Reply at 20–21.

     Although trespass is an intentional tort under District of Columbia law, it only requires "an intentional intrusion of a person or thing upon property that invades and disrupts the owner's exclusive possession of that property." *Garay v. Liriano*, 943 F. Supp. 2d 1, 25 (D.D.C. 2013), citing *Morgan v. Barry*, 12 Fed. App'x 1, 3 (D.C. Cir. 2000) (applying District law). Intent to violate property rights is not required. The same is true of nuisance claims in the District. *See McDonald's USA, LLC v. Craft*, 263 F. Supp. 3d 56, 63 (D.D.C. 2017).

     Rockhill concedes this point but insists that the particular allegations in the Wharf Suit accuse defendants of knowingly violating the commercial tenants' property rights. Pl.'s Reply at 21. It points out that the underlying complaint alleges that the District of Columbia and the developer defendants "entered into a conspiracy to run the [p]laintiffs out of the Municipal Fish Market by destroying [p]laintiffs' businesses." Wharf Compl. ¶ 3. Rockhill argues that because "purposeful intent – or 'conscious desire' to achieve a 'result' – is the essence of conspiracy,"

those claims fall under the "knowing violation exclusion." Pl.'s Mem. at 23–24, *quoting U.S. v. Childress*, 58 F.3d 693, 707–08 (D.C. Cir. 1995).

The Court disagrees. When determining whether to apply an exclusion based on the allegations of the underlying complaint, courts ask whether an allegation amounts to mere "puffing," and is otherwise "not essential to the complaint." *Cont'l Cas.*, 809 F.2d at 897, quoting *Sachs v. St. Paul Fire and Marine Ins. Co.*, 303 F. Supp. 1339, 1341 (D.D.C. 1969). Here, there is no "conspiracy" count brought against the defendants, so that allegation is not essential, and the conduct alleged under the trespass count, encompasses both intentional and unintentional acts and it does not allege that the defendants knowingly violated the tenants' property rights. *See* Wharf Compl. ¶¶ 266, 273.

For these reasons, the Court finds that there is at least one claim that falls within the Coverage B section of the Policy that is not barred by any express exclusion. Accordingly, based on the allegations in the Wharf Suit and the Policy, the Court finds that Rockhill has a duty to defend the insured defendants.

### vi.    Recoupment

In Count I of its complaint, Rockhill sought a declaration that it "does not owe a duty to defend or indemnify the [d]efendants," and to recover "attorneys' fees, costs, and expenses incurred in defense of non-covered claims." Compl. ¶ 77. Since the Court has found that Rockhill owes the insured defendants a duty to defend, it will deny Rockhill's motion for judgment on this count. Pl.'s Mem. at 29. It is well-established that even if one claim potentially falls within the terms of the policy, the insurance company is obligated to defend against all of the claims. *Council For Responsible Nutrition*, 2007 WL 2020093, at *3, citing *Cont'l Cas.*, 809 F.2d at 895; *see also Commonwealth Lloyds Ins.*, 32 F. Supp. 2d at 18

(collecting cases). So reimbursement of "covered" and "non-covered" claims is not permissible when a Court finds there is a duty to defend.[9]

### b. Count III

In Count III of its complaint, Rockhill claims that it "does not owe a duty to defend or indemnify" the current landlord, defendant Fish Market REIT, because it is not an insured under the Policy. Compl. ¶¶ 87–88. It seeks a declaration to that effect and reimbursement of at least 50% of all defense costs incurred since Fish Market REIT was added as a party to the Wharf Suit in February 2017. *Id.* ¶¶ 85, 88. Rockhill also asks the Court to order that Fish Market REIT be defended going forward by separate counsel at its own cost, and that counsel keep any billing for work done for the non-insured entity separate from any other work on the case. Pl.'s Reply. at 29, citing Compl. ¶ 88. Rockhill moved for judgment on the pleadings on this count; defendants did not. Therefore, the Court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable" to defendants. *Peters*, 966 F.2d at 1485.

Here, defendants concede that Fish Market REIT is not insured under the Policy. In their cross-motion, defendants included a set of "facts which must be accepted as true for purposes of ruling on Rockhill's motion." Defs.' Cross-Mem. at 4. It contained a list of defendants in the

---

9      The Fourth Circuit reached a similar conclusion in *Perdue Farms Incorporated v. Travelers Casualty and Surety Company of America* 448 F.3d 252, 258 (4th Cir. 2006) holding that:

> Under Maryland's comprehensive duty to defend, if an insurance policy potentially covers any claim in an underlying complaint, the insurer, as Travelers did here, must typically defend the entire suit, including non-covered claims. Properly considered, a partial right of reimbursement would thus serve only as a backdoor narrowing of the duty to defend, and would appreciably erode Maryland's long-held view that the duty to defend is broader than the duty to indemnify.

*Id.* at 258 (internal citations omitted).

Wharf Suit that are insured under the Policy, and defendant Wharf Fish Market REIT was not included. *Id.* at 4–5. And in an April 22, 2017 letter attached to the defendants' cross-motion, defendants admit that Fish Market REIT is a non-insured party. *See* April 22, 2017 Defs.' Letter at 6 ("You correctly point out that Wharf Fish Market REIT Leaseholder ("WFMRL") is not [Rockhill's] insured."). In response to Rockhill's motion, defendants simply contend that Fish Market REIT's "presence in the Wharf Lawsuit does not absolve Rockhill of its contractual obligation to defend against the entire litigation." Cross-Mem. at 33–39. That is a separate issue.

Rockhill's Coverage B establishes a "duty to defend the *insured* against any 'suit' seeking . . . damages" due to "personal and advertising injury." Policy at RHIC000029. (emphasis added). Based on the Court's review of the Policy, and accepting the defendants' allegations as true, as it must at this stage, the Court finds that Fish Market REIT is not a named insured or an additional insured under the terms of the Policy. Therefore, Rockhill does not owe it a duty to defend, and judgment will be entered in favor of plaintiff Rockhill on this issue.

What happens next is less clear. Rockhill seeks to recover defense costs already expended from Fish Market REIT. In its motion, Rockhill argues that "equity dictates that Rockhill is entitled to 50% of all defense costs incurred and paid since the true lessor party-in-interest, Fish Market REIT voluntarily joined the Wharf Suit on February 13, 2017." Pl.'s Mem. at 32. Rockhill also requests that the Court order Fish Market REIT to "be defended going forward by separate counsel at its own funding, and keep separate any billing for work done for the non-insured entity." Pl.'s Reply at 29.

Again, defendants do not contest that Fish Market REIT is a non-insured party, and they focus their argument instead on whether recoupment of defense costs is a recognized right in this

jurisdiction when a court determines that there is no duty to defend or that only some claims are potentially covered by the insurance contract. Defs.' Cross-Mem. at 35–37; Cross-Reply at 20–21. Defendants are correct that there is no recognized right to recover defense costs in this jurisdiction from *insureds*, and that several courts have rejected this proposition based on the broad nature of the duty to defend. *See, e.g, Perdue Farms Inc.* 448 F.3d at 258 (4th Cir. 2006). But that principle is absent here, since Fish Market REIT is not an insured, and Rockhill does not owe it a duty to defend.

The Court was unable to find District of Columbia cases that address the issue of allocation of defense costs between insured and non-insured parties in a single suit. However, the New York Supreme Court's ruling in *Health-Chem Corporation v. National Union Fire Insurance Company of Pittsburgh* is instructive on this point. 559 N.Y.S.2d 435, 437 (Sup. Ct. 1990). In that case the court analyzed whether an insurance company had a right to "'allocate' the expenses incurred, between those [parties] which are covered by the insurance policy, and those which are not." *Id.* The Court found that:

> allocation is permitted if factually possible. [The insurance company] is only liable for the expenses of defending certain defendants. If additional expenses were incurred in defense of the action on behalf of the non-covered defendants, there is no reason why [the insurance company] should be required to pay such expenses. To put it another way, the coverage afforded by the policy should not now be expanded.

*Id.* 559 N.Y.S.2d at 438. In that case, the court found that there remained issues of fact as to what amount was properly ascribable to the defense of the non-covered defendant in a suit in which the covered and non-covered parties were represented by the same law firm. *Id.* The Court ordered further discovery, specifically of the law firm's billing records. *Id.*

Here, the Court finds that Rockhill has not supplied the Court with evidence that would enable it to determine whether it is factually possible to allocate defense costs between the

insured and non-insured defendants.  And it certainly has not supplied evidence to justify its 50% figure.  Rockhill points outs that the complaint alleges certain misconduct that occurred in 2017, after Fish Market REIT became the landlord, and after the policy coverage had expired.  Pl.'s Reply at 28, citing Wharf Compl. ¶¶ 187–93.  It argues that such misconduct is attributed solely to Fish Market REIT; *id.,* and that may be so.  But that does not explain how the defense costs expended to this point can be segregated.  The counts are levied against all of the developer defendants, *see* Wharf Compl. ¶¶ 221–90, and the underlying plaintiffs do not distinguish between the various defendants in the suit, who they refer to collectively as "developer defendants" or the "landlord," or each others' "alter egos."  Wharf Compl. ¶ 1 n.1.  Moreover, one cannot tell from the pleadings alone whether, or to what extent, the defense efforts have been directed at the claims arising in 2017.

Rockhill contends it is entitled to 50% of the defense costs incurred since Fish Market REIT joined the suit but it has not supplied the Court with any documentation to support that allocation.  Pl.'s Mem. at 31–32.  It vaguely argues that its proposal is "equitable" because Fish Market REIT is the current landlord, and it stands to be impacted by the injunctive relief sought by the underlying plaintiffs.  Pl.'s Reply at 7.  That is plainly insufficient.

Because plaintiff has not put forth an adequate framework to segregate costs incurred between insured and non-insured parties, and it has provided no evidence to support the 50% allocation it seeks, the Court will deny this portion of its motion without prejudice to reconsideration based on an additional submission.

Further, defendant has not provided justification for the Court to insert itself in the issue of defendants' selection of counsel; to the extent any lawyer representing Fish Market REIT and/or any other developer defendant can segregate time spent on matters related to Fish Market REIT alone in its billing records, it should do so. But plaintiff Rockhill's request for judgment on the pleadings will be denied with respect to this portion of Count III of its complaint.

## II.    DEFENDANTS' COUNTERCLAIMS

### a.   Count I (The December 2015 Agreement)

Rockhill has moved for judgment on the pleadings on all three of defendants' counterclaims. Since defendants are the non-moving parties, the Court must assume the truth of their factual allegations and draw any positive inference in their favor when resolving the issues.

In Count I of their counterclaim, defendants allege that the "December 2015 Agreement is a binding and enforceable contract," Countercl. ¶ 76, and that "Rockhill has breached the December 2015 Agreement by refusing to pay the defense costs that have been incurred in defense of the Wharf Suit, and by incorrectly claiming that it does not have to pay for the costs of defending certain claims, as well as the costs of mounting the counterclaim." *Id.* ¶ 79. Additionally, they allege "Rockhill has breached the December 2015 Agreement by deducting amounts that it claims are not reimbursable due to Rockhill's 'guidelines,'" *id.* ¶ 80, and "by attempting to impose arbitrary and capricious obligations upon Pillsbury for approval of strategic decisions and defense related costs (such as compensation of experts)." *Id.* ¶ 81.

Rockhill firmly rejects defendants' claim that it promised to fund the entirety of the defense of the Wharf Suit without a reservation of rights in December 2015. Pl.'s Mem. at 32. Rockhill insists that it is entitled to judgment as a matter of law because "even taking the facts pled in the Counterclaim as true, there are no allegations suggesting that the parties ever mentioned treating the December 2015 Agreement as superseding Rockhill's detailed [Initial Reservation of Rights]." *Id*.

But that is precisely what defendants allege in their counterclaim. Defendants allege that Rockhill entered into the December 2015 Agreement where it agreed to "defend the [d]eveloper [d]efendants against the entire Wharf Suit," Countercl. ¶ 1, and "[t]hat agreement was made by Rockhill without any reservation of rights regarding the duty to defend." *Id*. According to defendants, the December 2015 Agreement was negotiated by Rockhill adjustor Leslie Bowles and defendants' counsel, Pillsbury, during a conference call. *Id*. ¶ 22. They allege that during the conference call, Bowles "confirmed" that Rockhill's denial of coverage was "improper," and that defendants were "entitled to defense costs, at Pillsbury's normal rates for representation, from the date of the initial tender of defense through the date that Rockhill reversed its position and accepted defense of the Wharf Suit." *Id*. ¶¶ 22–23. The parties then struck a bargain: the developer defendants "would forego their right of full reimbursement of the defense costs," *id*. ¶ 23, accepting the lower *Laffey* rates, and in turn, "Rockhill would waive its right to control the defense and select counsel in favor of the [d]eveloper [d]efendants' right to direct their own defense with their chosen counsel (Pillsbury)." *Id*. According to defendants' counterclaim, after the phone conversation, the agreement was memorialized in a December 1, 2015 email exchange between Bowles and a Pillsbury attorney. *Id*. ¶ 26. That email exchange is reproduced in full below:

**From:** Bowles, Leslie
**To:** McNamara, Michael S.
**Cc:** Miller, David L.
**Subject:** RE: Wharf DC Mediation Schedule
**Date:** Tuesday, December 1, 2015 6:44:53 PM
**Attachments:** image002.png image003.png image004.jpg

Hi Michael,

No problem at all, as I believe you did pass this info along to me already. Either that or I am psychic, because I knew it wasn't happening. I wasn't planning on being in DC on December 18th. If you think I'll add real value by attending, let me know. But my guess is you guys can just update me after the fact.

Thanks for agreeing to the Laffey matrix. Are your billing folks able to send revised billing for the work you've done since the initial tender to Rockhill, so I can get you paid?

Thanks again for working with us on this. And I look forward to our continued relationship.

Kind regards,

Leslie

**From:** McNamara, Michael S. [mailto:michael.mcnamara@pillsburylaw.com]
**Sent:** Tuesday, December 01, 2015 5:23 PM
**To:** Bowles, Leslie
**Cc:** Miller, David L.
**Subject:** FW: Wharf DC Mediation Schedule

Leslie,

I'm terribly sorry but I just realized, to my horror, that I didn't send this to you. Our mediation is no longer set for December 17-18. It has been rescheduled for late January. And we have a pre- meeting with the mediator on December 18. It would be good if you could attend that with us. If you still have December 18 on your calendar, presumably you are available and in DC then.

Separately, I owe you a response on rates. We are ok with the Laffey matrix you suggested. Could we schedule a short call for tomorrow or Thursday to discuss the logistics? I'm available from 11:00am until 4:00 Eastern time. In the meantime, we'll get you a list of our team and their experience levels so you've got the rate range.

Regards, Michael

Ex. A to Defs.' Countercl. [Dkt. # 17-1].

According to defendants, these emails memorialized the terms of a contract in which Rockhill agreed to fund the entirety of defense without reservation of rights. Countercl. ¶ 1. The counterclaim itemizes the terms of the December 2015 Agreement as follows: "(1) Rockhill agreed to waive its right to select counsel for the [d]eveloper [d]efendants; (2) the [d]eveloper [d]efendants agreed to waive their right to be fully reimbursed for the substantial work already undertaken by its chosen counsel – Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury") – at Pillsbury's regular rates; and (3) Rockhill agreed to pay for Pillsbury's time (both for previous work and for work going forward) at "*Laffey* Matrix" rates." *Id.* ¶ 1.

The problem with defendants' counterclaim is that those terms are plainly not reflected in the cursory email exchange that simply states that the parties reached some agreement with respect to *Laffey* rates. *See* Ex. A to Countercl. [Dkt. # 17-1]. Defendants contend that the rest of the terms are essentially implied, and that the evidence of the phone call with Bowles and the documents in the claim file illuminate the terms of the agreement. Cross-Reply at 2.

Rockhill concedes that it agreed to "pay independent counsel at *Laffey* Matrix rates," but it contends that, *"[a]t no point* did Rockhill or the [d]eveloper [d]efendants *discuss or agree* that the reservations pursuant to which the defense was provided would be altered, withdrawn, or otherwise waived, or that the usual and customary processing and payment practices of Rockhill would be altered, ignored, or specially accommodated for any of the [d]eveloper [d]efendants or their uninsured affiliates." Rockhill Answer ¶ 21 (emphasis added). In other words, the parties acknowledge that they entered into an additional agreement, but they dispute the nature and terms of the December 2015 Agreement and what happened on the call with Bowles.

Given the inconsistencies in the allegations about the content of the phone call and the fact that the supposedly memorializing email says little, the Court is unable to rule as a matter of law on the pleadings alone that anything was agreed upon except possibly the fact that the developers could use Pillsbury and that Rockhill would pay *Laffey* rates going forward. Since the terms of the December 2015 Agreement are unclear, the Court is unable to determine whether it was breached as a matter of law, and these claims must move forward.

Rockhill's arguments give rise to serious concerns about whether the defendants will be able to prove that an adjustor single-handedly waived the company's reservation of rights, modified a policy that states that any modifications must be in writing, and agreed to fund the entirety of the defense in a phone call and an email that says nothing of the sort. But as the D.C. Circuit recently stressed, even when the "court is convinced that the party opposing the motion is unlikely to prevail at trial," judgment on the pleadings is not appropriate if there are "issues of fact." *Liberty Mar.*, 933 F.3d at 761, quoting *Wager*, 575 F.2d at 884. Accordingly, the Court will deny Rockhill's motion on Count I of the counterclaim.

### b. Count II (The Policy)

In Count II of their counterclaim, defendants allege that Rockhill breached its duty to defend under the Policy by, "refusing to recognize that it is obligated to cover the costs of the [d]eveloper [d]efendants' defense of all claims asserted against them in the Wharf Suit as well as the inextricably interwoven costs relating to the strategy of defending the lawsuit by asserting counterclaims against the [underlying plaintiffs]." Countercl. ¶ 87. They further allege that, Rockhill breached its duty to defend by intentionally delaying payments of defense costs, *id.* ¶ 89, and by demanding that defendants allocate defense costs between what Rockhill believes are covered and non-covered claims. *Id.* ¶ 88.

Rockhill moved for judgment on the pleading on this count, arguing that since it does not owe a duty defend, it necessarily did not breach that duty. Pl.'s Mem. at 36. Since the Court has found that plaintiff does owe a duty to defend the insured defendants under the Policy, it will deny Rockhill's motion in part, but it will grant the motion in part as to defendant Fish Market REIT, the non-insured defendant.

### c. Count III (The Policy and the December 2015 Agreement)

In Count III of the counterclaim, defendants allege that Rockhill breached the implied covenant of good faith and fair dealing underlying both the Policy and the December 2015 Agreement by failing to carry out its contractual duties. Countercl. ¶¶ 92–96. Again, Rockhill moves for judgment on the pleadings, arguing that it does not owe the defendants a duty to defend. Pl.'s Mem. at 36–37. Regarding the claim under the Policy, the Court will deny plaintiff's motion for judgment as to the insured defendants, since Rockhill owes them a duty to defend, but it will grant the motion as to Fish Market REIT, the non-insured defendant. The motion is denied concerning the December 2015 Agreement because questions of fact remain on whether that agreement gave rise to a duty to defend the developer defendants.

### CONCLUSION

For the reasons stated, the Court enters the following rulings:

### ROCKHILL'S COMPLAINT

Count I:

- As to the duty to defend under the Policy, the Court **DENIES** plaintiff Rockhill's motion on Count I of its complaint, and **GRANTS** the defendants' cross-motion, finding that Rockhill has a duty to defend the insured developer defendants, WHRL, HMW, HSW, WDGPJV, WDJV, and WHR, under the Policy.

- As to the right to recoup defense costs under the Policy, the Court **DENIES** plaintiff Rockhill's motion on Count I of its complaint, and **GRANTS** the defendants' cross-

motion, finding that Rockhill is not entitled to recover from the insured developer defendants costs incurred in their defense.

- This ruling does not address, the remaining claim under this Count, whether Rockhill owes a duty to indemnify the developer defendants.

Count III:

- As to the duty to defend Fish Market REIT, the Court **GRANTS** plaintiff Rockhill's motion on Count III of its complaint, and finds that Fish Market REIT is a non-insured and Rockhill does not owe it a duty to defend under the Policy.

- As to Rockhill's entitlement to 50% recoupment of defense costs from Fish Market REIT, the Court **DENIES** plaintiff Rockhill's motion on Count III of its complaint without prejudice because it has not shown that segregation of defense costs is possible, and it has not provided documentary support for the allocation it seeks.

- As to the order that Fish Market REIT be defended by separate counsel at its own funding, and that it keep separate any billing for work done for the non-insured entity, the Court will **DENY** the request for an order that Fish Market REIT must retain separate counsel, but if counsel remains, it must segregate hours expended on work related to Fish Market REIT alone in its ongoing billing.

## DEFENDANTS' COUNTERCLAIMS

Count I:

- As to the breach of the terms of the 2015 Agreement, the Court **DENIES** plaintiff Rockhill's motion.

Count II:

- As to the breach of the duty to defend under the Policy, the Court **DENIES** plaintiff Rockhill's motion as to the developer defendants.  The Court **GRANTS** this motion as to Fish Market REIT, the uninsured defendant.

Count III:

- As to the breach of the implied covenant of good faith and fair dealing, the Court **DENIES** plaintiff Rockhill's motion as to the developer defendants. The Court **GRANTS** this motion as to Fish Market REIT, the uninsured defendant.

A separate Order will issue.


AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2019