## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ROCKHILL INSURANCE COMPANY, | ) | |
| | ) | |
| *Plaintiff/Counter-Defendant,* | ) | |
| | ) | |
| v. | ) | No. 18-cv-02104-ABJ |
| | ) | |
| HOFFMAN-MADISON WATERFRONT, | ) | |
| LLC,  HOFFMAN-STRUEVER | ) | |
| WATERFRONT, LLC,  WHARF DISTRICT | ) | |
| GP JOINT VENTURE, LLC,  WHARF | ) | |
| DISTRICT JOINT VENTURE LP, | ) | |
| WHARF HORIZONTAL REIT, LLC, | ) | |
| WHARF HORIZONTAL REIT | ) | |
| LEASEHOLDER, LLC, and WHARF FISH | ) | |
| MARKET REIT LEASEHOLDER, LLC, | ) | |
| | ) | |
| *Defendants/Counter-Plaintiffs,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE WHARF, INC., t/a THE WHARF, | ) | |
| BRW, INC., t/a CAPTAIN WHITE | ) | |
| SEAFOOD CITY, and SALT WATER | ) | |
| SEAFOOD, INC., t/a SALT WATER, | ) | |
| | ) | |
| *Defendants*. | ) | |

## ROCKHILL'S AMENDED COMPLAINT FOR
## DECLARATORY JUDGMENT & OTHER RELIEF

The Plaintiff, ROCKHILL INSURANCE COMPANY ("Rockhill"), by and through its

attorneys, Adam H. Fleischer and Justin K. Seigler of BatesCarey LLP, and Kelly M. Lippincott

of Gordon Rees Scully Mansukhani, and for its Amended Complaint for Declaratory Judgment

& Other Relief against the above-captioned Defendants, brought pursuant to the Declaratory

Judgment Act, 28 U.S.C. § 2201 *et seq.*, states as follows:

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

THE PARTIES .................................................................................................................... 4

JURISDICTION & VENUE ............................................................................................... 6

FACTUAL BACKGROUND .............................................................................................. 7

    I.    THE UNDERLYING PRE-LITIGATION LEASE DISPUTE ............................................ 7

    II.   THE UNDERLYING LEASE DISPUTE TURNS INTO THE WHARF SUIT ..................... 10

    III.  THE CONTRACT CLAIMS ASSERTED IN THE UNDERLYING COMPLAINT ............... 12

    IV.  ROCKHILL AGREES TO PROVIDE A CONDITIONAL DEFENSE WITH RESPECT
        TO THE WHARF SUIT PURSUANT TO A COMPLETE RESERVATION OF RIGHTS ..................... 13

THE ROCKHILL POLICY ............................................................................................... 14

THE DEVELOPER DEFENDANTS' FAILURES TO COOPERATE
WITH ROCKHILL'S REQUESTS RELATING TO OTHER INSURANCE ..................... 21

THE ZURICH POLICY ...................................................................................................... 27

NOTICE TO ZURICH & ITS DENIAL OF THE TENDER .................................................. 32

COUNT I – NO DUTY TO DEFEND OR INDEMNIFY THE DEVELOPER DEFENDANTS
& RECOUPMENT OF DEFENSE COSTS (PLED FOR APPEAL PURPOSES ONLY) ................................. 32

COUNT II – RIGHT TO EQUITABLE ALLOCATION BETWEEN POTENTIALLY-
COVERED & NON-COVERED DEFENSE COSTS .............................................................. 36

COUNT III – NO DUTY TO DEFEND OR INDEMNIFY THE NON-INSURED
LANDLORD, FISH MARKET REIT, & RECOUPMENT OF DEFENSE COSTS
INCURRED ON ITS BEHALF (RESOLVED IN PART BY THE COURT'S ORDER, DKT. 36) .................... 37

COUNT IV – BREACH OF CONTRACT – "COOPERATION" & "OTHER INSURANCE"
CLAUSES ........................................................................................................................ 39

COUNT V – BREACH OF THE IMPLIED DUTY OF GOOD FAITH & FAIR DEALING ......................... 43

## NATURE OF THE ACTION

1.      Rockhill seeks a declaration that it does not owe a duty to defend or indemnify its insured, Wharf Horizontal REIT Leaseholder, LLC ("WHRL"), or WHRL's affiliated entities named as defendants herein (identified individually below and referred to collectively as the "Developer Defendants")[1] with respect to the operative complaint in an underlying commercial redevelopment and lease dispute with The Wharf, Inc., BRW, Inc., and Salt Water Seafood, Inc. (collectively, the "Underlying Plaintiffs"), which is currently pending in this judicial district under case no. 15-cv-01198-CKK (the "Wharf Suit").

2.      In the Wharf Suit, the Underlying Plaintiffs allege that the Developer Defendants engaged in construction activities as part of the $2-billion redevelopment of the entire Southwest Waterfront (the "Redevelopment Project"), and that these construction activities infringed on the Underlying Plaintiffs' rights as the existing tenants of various barge spaces at one end of the Redevelopment Project.

3.      For approximately $11,000 in premium, Rockhill provided a Commercial General Liability "Lessor's Risk" policy (the "Rockhill Policy") to the landlord of the barge spaces, which included a number of the Developer Defendants—specifically HMW, HSW, WDGPJV, WDJV, WHR, and WHRL—as insureds.  *See* Ex. I to Compl. (Dkt. 1-10) at RHIC000068.  The Rockhill Policy included an endorsement providing that if there were losses arising from

---

[1] Defendants Hoffman-Madison Waterfront, LLC ("HMW"), Hoffman-Struever Waterfront, LLC ("HSW"), Wharf District GP Joint Venture, LLC ("WDGPJV"), Wharf District Joint Venture LP ("WDJV"), Wharf Horizontal REIT, LLC ("WHR"), Wharf Horizontal REIT Leaseholder, LLC ("WHRL"), and the entity determined by the Court not to be a Rockhill insured (*see* Dkt. 36), Wharf Fish Market REIT Leaseholder, LLC ("Fish Market REIT"), are collectively referred to herein as the "Developer Defendants," and are otherwise individually referred to where appropriate.  The Developer Defendants who qualify as insureds under the Rockhill Policy (HMW, HSW, WDGPJV, WDJV, WHR, and WHRL) are referred to as the "Insured Developer Defendants" where appropriate.

construction operations, the Rockhill Policy would apply on an excess basis to any other policies available to the Developer Defendants for the construction. *See id*. at RHIC000055.

4.      In October 2015, Rockhill agreed to defend the Developer Defendants in the underlying construction dispute subject to a reservation of rights. Over the course of the next five years, Rockhill repeatedly sought information from the Developer Defendants as to what other liability insurance they had in place to cover damages arising from the construction activities alleged in the Wharf Suit.

5.      With the Developer Defendants representing that no other policies would apply to the construction activities alleged in the Wharf Suit, or otherwise equivocating as to whether such insurance might be in place, in September 2018 Rockhill filed this action to determine its own coverage obligations and to confirm the likely existence of such other insurance.

6.      On September 30, 2019, with the Developer Defendants still declining to cooperate with Rockhill's requests for other insurance applicable to the underlying construction activities, this Court ruled that Coverage B of the Rockhill Policy (which covers certain "personal and advertising injury") gave rise to a duty to defend the Insured Developer Defendants, but not the current landlord, Fish Market REIT, who the Court determined does not qualify as an insured. *See* Dkt. 36. The Court's ruling left open Rockhill's right to pursue discovery into the existence of other insurance for the construction activities at issue.

7.      On March 30, 2020, after years of Rockhill's pursuing the other insurance applicable to the underlying construction, and after this Court's ruling on Coverage B, the Developer Defendants finally produced a Commercial General Liability policy issued by Zurich American Insurance Company ("Zurich") to the contractor who the Developer Defendants had hired to oversee and implement the construction activities alleged in the Wharf Suit, Clark

Construction Group, LLC ("Clark").  A redacted excerpt of the Zurich Policy is attached hereto as Exhibit 1.[2]  Of note:

    a.   This newly-produced policy specifically lists HSW, WDGPJV, WHR, and WHRL as Named Insureds, and also extends insured status to HMW, with respect to the Redevelopment Project.  Ex. 1 at Developers_00000084, Developers_00000036.

    b.   This newly-produced policy contains the identical Coverage B ("personal and advertising injury") language that the Developer Defendants had successfully argued to this Court gives rise to a duty to defend under the Rockhill Policy.  *See id.* at Developers_00000033, Developerss_00000041.

    c.   This newly-produced policy contains an "other insurance" clause which, when compared with the Rockhill "other insurance" clause, renders the newly-produced policy primary and non-contributory—meaning that it would otherwise defend and indemnify covered claims before any potentially applicable "other insurance" such as the Rockhill Policy.  *Id.* at Developerss_00000055.

8.    After the Developer Defendants refused to tender their defense to the newly-disclosed insurer of the construction activities, Zurich, Rockhill notified Zurich of the Wharf Suit and asked that it take over the defense.  Zurich declined based on the fact that the Developer Defendants had never provided notice of the Wharf Suit at any point during its five-year pendency, and because this Court had already ruled that Rockhill owes a duty to defend under the common language of Coverage B.

9.    Had the Developer Defendants cooperated with Rockhill's requests years earlier that they notify other applicable carriers of the Wharf Suit and provide Rockhill with other applicable policies, the Rockhill Policy would have applied excess of the newly-disclosed construction policy issued by Zurich, or at the very least would have applied on a co-primary (50%-50%) basis with that policy.  This would have resulted in Rockhill not having been forced

---

[2] Rockhill has attached a redacted excerpt of the Zurich Policy because the Developer Defendants produced it under the confidentiality designations of the protective order.  After a meet-and-confer process, the parties agreed to remove the confidentiality designations from the attached excerpts, subject to certain redactions, without waiver of the right to challenge those protections as applied to these pages and the other omitted pages of the Zurich Policy.

to pay, or paying only a fraction of, the substantial fees and costs paid to the Developer Defendants' counsel, Pillsbury, over the last five years.

10.     This Amended Complaint seeks damages for the Insured Developer Defendants' breach of the Rockhill Policy's "cooperation" and "other insurance" provisions, or alternatively the Insured Developer Defendants' breach of their duty of good faith and fair dealing.  Rockhill also pleads the relief sought in its original Complaint, including Count I (now resolved, *see* Dkt. 36, pled for appeal purposes only) and Counts II and III (partially resolved, *see* Dkt. 36), which seek allocation of non-covered costs incurred on behalf of and in defense of the non-insured landlord, Fish Market REIT.

## THE PARTIES

11.     Rockhill is an Arizona insurance company with its principal place of business located in Kansas City, Missouri.

12.     Hoffman-Madison Waterfront, LLC ("HMW") is a limited liability company organized under the laws of the District with its principal place of business located in the District.  Upon information and belief, HMW is a joint venture comprising its members, P.N. Hoffman & Associates, Inc. and Madison Marquette Property Investments, LLC ("Madison Marquette").  P.N. Hoffman & Associates, Inc. is a corporation organized under the laws of the District with its principal place of business located in the District.  Upon information and belief, none of the members of Madison Marquette, and none of HMW's other members, if any, whether persons or business entities, are domiciled in Arizona or Missouri.

13.     Hoffman-Struever Waterfront, LLC ("HSW") is a limited liability company organized under the laws of the District with its principal place of business located in the District.  HMW (*see* ¶ 9 above) is a member of HSW.  Upon information and belief, none of

HSW's other members, if any, whether persons or business entities, are domiciled in Arizona or Missouri.

14.    Wharf District GP Joint Venture, LLC ("WDGPJV") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in the District.  Upon information and belief, none of WDGPJV's members, whether persons or business entities, are domiciled in Arizona or Missouri.

15.    Wharf District Joint Venture LP ("WDJV") is a limited partnership organized under the laws of the State of Delaware with its principal place of business located in the District.  Upon information and belief, HSW (*see* ¶ 10 above), WDGPJV (*see* ¶ 11 above), and The Public Sector Pension Investment Board (the "Pension Board") are partners in WDJV.  The Pension Board is a Crown Corporation incorporated under the Public Sector Pension Investment Board Act of Canada, with its principal place of business located in Montreal, Canada.

16.    Wharf Horizontal REIT, LLC ("WHR") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in the District.  WDJV (*see* ¶ 12 above) is the sole member of WHR.

17.    Wharf Horizontal REIT Leaseholder, LLC ("WHRL") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in the District.  WHR (*see* ¶ 13 above) is the sole member of WHRL.  Insofar as relevant herein, WHRL was the ***former landlord*** of Defendants The Wharf, Inc., BRW, Inc., and Salt Water Seafood, Inc.

18.    Wharf Fish Market REIT Leaseholder, LLC ("Fish Market REIT") is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in the District.  WHR (*see* ¶ 13 above) is the sole member of Fish Market REIT.

Insofar as relevant herein, Fish Market REIT is the ***current landlord*** of Defendants The Wharf, Inc., BRW, Inc., and Salt Water Seafood, Inc.

19.     The Wharf, Inc., t/a The Wharf ("Wharf, Inc."), is a corporation organized under the laws of the District with its principal place of business located in the District.  Rockhill seeks no affirmative relief from Wharf, Inc. other than to bind it to the judgment sought herein.  If Wharf, Inc. will stipulate to be so bound, then Rockhill will voluntarily dismiss it as a defendant in this action.

20.     BRW, Inc., t/a Captain White Seafood City ("Captain White"), is a corporation organized under the laws of the District with its principal place of business located in the District.  Rockhill seeks no affirmative relief from Captain White other than to bind it to the judgment sought herein.  If Captain White will stipulate to be so bound, then Rockhill will voluntarily dismiss it as a defendant in this action.

21.     Salt Water Seafood, Inc., t/a Salt Water ("Salt Water"), is a corporation organized under the laws of the Commonwealth of Virginia with its principal place of business located in the District.  Rockhill seeks no affirmative relief from Salt Water other than to bind it to the judgment sought herein.  If Salt Water will stipulate to be so bound, then Rockhill will voluntarily dismiss it as a defendant in this action.[3]

## JURISDICTION & VENUE

22.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the plaintiff and the defendants, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

---

[3] Defendants Wharf, Inc., Captain White, and Salt Water are collectively referred to herein as the "Underlying Plaintiffs."

23.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this litigation occurred in this judicial district.

## FACTUAL BACKGROUND

**I.    THE UNDERLYING PRE-LITIGATION LEASE DISPUTE**

24.     Insofar as relevant herein, the operative pleading in the Wharf Suit is the Underlying Plaintiffs' Third Amended Complaint (the "Underlying Complaint"), attached to Rockhill's Complaint as Exhibit A (Dkt. 1-2).

25.     The Underlying Plaintiffs allege that in 2000 and 2001 they entered into 30-year leases with the District which granted them "exclusive use of certain delineated water frontages," defined by lot number, "to run [their] businesses, as well as the right to access and use" the "Common Area" of the Municipal Fish Market, described as those areas "designated for the general use, convenience, and benefit of the commercial tenants in the area and their customers…(*e.g.*[,] restrooms, parking areas, driveways, walkways, loading and unloading areas for deliveries)."  Ex. A (Dkt. 1-2) at ¶¶ 47, 49, 55.

26.     The Underlying Complaint alleges that in 2006 the District chose HMW (then doing business as HSW) as the primary developer for a $2-billion redevelopment project designed to transform the Southwest Waterfront—specifically, "approximately 27 acres of land between the Municipal Fish Market and Fort McNair"—into a boardwalk strip of "retail shops, residential and office buildings, hotels, and parks" (said project being referred to in the Underlying Complaint and herein as the "Redevelopment Project").  *Id*. at ¶¶ 64-65.

27.     According to the Underlying Complaint, on April 23, 2014, the District assigned the Underlying Plaintiffs' leases to the Developer Defendants, "acting through WHRL, to facilitate the Redevelopment Project."  *Id*. at ¶ 70.

7

28.   After initial construction activities began in May 2014 with the closing of the Water Street access point to the Fish Market, the Underlying Complaint alleges that the Developer Defendants "repeatedly encroached onto the Common Area" and "materially interfered with [the Underlying] Plaintiffs' access to the Common Area" (for example, by building a fence there).  *See id*. at ¶¶ 94, 116.

29.   According to the Underlying Complaint, various construction activities occurring between May 2014 and August 2017, both on and off the Fish Market premises located at 1100 Maine Avenue SW, disrupted the Underlying Plaintiffs' businesses and resulted in damages, including but not limited to:

a)  alleged construction and movement of a fence in the Fish Market's Common Area (*see id.* at ¶¶ 117-21);

b)  alleged closure of, and digging in, Water Street (*see id.* at ¶¶ 94-98);

c)  alleged blocking of the Fish Market parking lot (*see id.* at ¶ 145);

d)  alleged extension of a sidewalk along the south side of Maine Avenue and moving parking toward or into the Common Area (*see id.* at ¶¶ 147-48);

e)  alleged installation of bollards in the Common Area (*see id.* at ¶¶ 151-52);

f)  alleged installation of signs regarding towing (*see id.* at ¶ 154);

g)  alleged use of the Fish Market parking lot by construction workers (*see id.* at ¶ 155);

h)  alleged fencing off of electricity panels (*see id.* at ¶ 186);

i)  alleged disruption of a water main line servicing the Fish Market (*see id.* at ¶¶ 187-89);

j)  alleged construction of buildings on the Common Area occurring from approximately May to August 2017 (*see id.* at ¶ 190); and

k)  alleged construction of continuous fencing along Main Avenue and additional fencing in the Common Area (*see id.* at ¶¶ 191-93).

30.    The Underlying Complaint alleges that the Developer Defendants met with the Underlying Plaintiffs and the District in May 2014, August 2014, and September 2014 to discuss revisions to the construction plans to accommodate the Underlying Plaintiffs' complaints, but that the parties were unable to reach an agreement, and disruptive construction activities continued. *See id.* at ¶¶ 122-158.

31.    Around this time, and during the construction activities referred to in paragraph 29 above, Clark was the general contractor, design-builder, or practical equivalent for the Wharf Redevelopment Project alleged in the Underlying Complaint, under contract with the Developer Defendants and/or their affiliate(s).   Redacted excerpts of the Clark contracts and the exhibits containing insurance requirements and schedules of work are attached hereto as Exhibit 2.[4]

32.    As the general contractor and/or design-builder for the Redevelopment Project, Clark (and/or its independent contractors and//or subcontractors of any tier) performed one or more of the allegedly infringing construction activities alleged in the Underlying Complaint, including but not limited to one or more of those activities referred to in paragraph 29 above. *See, e.g.*, Ex. 2 at Developers_00001822-28, Developers_00001581-85.

33.    On April 20, 2015, after HMW noticed certain construction activities on the Underlying Plaintiffs' barges, counsel for the Developer Defendants sent them a "Lease Default Notice" alleging "violations of the lease for failure to obtain necessary construction permits." Ex. A to Compl. (Dkt. 1-2) at ¶¶ 160, 169.

---

[4] Rockhill has attached redacted excerpts of the contracts and exhibits because the Developer Defendants produced these materials under the confidentiality designations of the protective order.   After a meet-and-confer process, the parties agreed to remove the confidentiality designations from the attached excerpts, subject to certain redactions, without waiver of the right to challenge those protections as applied to these pages and the other contract documents.

34.    On or about June 25, 2015, the Developer Defendants then issued Notices to Quit and Vacate the leased premises to the Underlying Plaintiffs.  *See id*. at ¶¶ 176, 178.  Copies of the Notices to Quit are attached to Rockhill's Complaint as Exhibit B (Dkt. 1-3).

35.    In the Notices to Vacate, the Developer Defendants alleged that the Underlying Plaintiffs breached their leases by utilizing a certain barge as a dining area and conducting certain construction activities without the requisite landlord approval or permits.  *See generally* Ex. B (Dkt. 1-3).

## II.    THE UNDERLYING LEASE DISPUTE TURNS INTO THE WHARF SUIT

36.    Upon information and belief, the Underlying Plaintiffs responded to the Developer Defendants' Notices to Vacate by filing the Wharf Suit on July 23, 2015, naming HMW, WHRL, and the District as the only defendants.

37.    On or about August 6, 2015, WHRL filed formal eviction complaints against the Underlying Plaintiffs in the Superior Court of the District of Columbia under case nos. LTB 18957-15 and LTB 18958-15 (collectively, the "Eviction Proceedings").  Copies of WHRL's Verified Complaints in the Eviction Proceedings are attached to Rockhill's Complaint as Exhibit C (Dkt. 1-4).

38.    In the Eviction Proceedings, WHRL alleged that the Underlying Plaintiffs breached their leases.  *See* Ex. C (Dkt. 1-4) at ¶¶ 3(B)(2)(a), (C).

39.    On March 29, 2016, WHRL filed its Counterclaim against the Underlying Plaintiffs in the Wharf Suit, which alleged that the Underlying Plaintiffs breached their leases in a number of ways.

40.    Upon information and belief, on or about April 15, 2016, WHRL voluntarily dismissed the Eviction Proceedings.

41.     On May 9, 2016, WHRL filed its Amended Counterclaim against the Underlying Plaintiffs in the Wharf Suit alleging that the Underlying Plaintiffs breached their leases in a number of ways, including, *inter alia*, using a certain barge as a dining area.  *See* WHRL's Amended Counterclaim, attached to Rockhill's Complaint as Exhibit D (Dkt. 1-5), at ¶¶ 147-54, 190-95.

42.     On or about October 31, 2016, the original landlord, WHRL, assigned its interest in the Underlying Plaintiffs' leases to a newly-created landlord entity, Fish Market REIT.  In doing so, the new landlord, Fish Market REIT, agreed to be responsible for all attorneys' fees in connection with liability arising from the leased premises accruing after October 31, 2016.  The original landlord, WHRL, likewise agreed to be responsible for attorneys' fees in connection with liability arising from the premises prior to October 31, 2016.

43.     On February 12, 2017, the former landlord, WHRL, filed an "Unopposed Motion to Add Counterclaim-Plaintiff and Defendant" seeking to join the Underlying Plaintiffs' current landlord, Fish Market REIT, as a party in the Wharf Suit, which was granted on February 13, 2017.

44.     On April 26, 2017, the Underlying Plaintiffs filed their Second Amended Complaint in the Wharf Suit, naming—in addition to then-parties HMW, WHRL, Fish Market REIT, and the District—WDGPJV, WHR, HSW, and WDJV as additional defendants.

45.     On September 12, 2017, the Underlying Plaintiffs filed an unsealed copy of the Third Amended Complaint in the Wharf Suit (referred to herein as the "Underlying Complaint"). *See* Ex. A (Dkt. 1-2).

46.     The Underlying Complaint alleges that the Wharf Suit "is an action to protect [the Underlying Plaintiffs]…against the destruction of their businesses" by the District and the

Developer Defendants, who, having found that the Underlying Plaintiffs' "rights under [their] leases conflicted with the District's and with [the Developer Defendants'] development plans…entered into a conspiracy to run the [Underlying] Plaintiffs out of the Municipal Fish Market by destroying [their] businesses." *Id*. at ¶¶ 1, 3. The Underlying Plaintiffs allege that this conspiracy "encompasses a pattern of egregious acts including harassment, governmental overreach, continuous material breaches of Plaintiffs' leases, and unjust attempts to oust the Plaintiffs from their leased property." *Id*. at ¶ 4.

47. The Underlying Complaint does not allege any theory of common law negligence or privacy tort against the Developer Defendants. *See generally id*.[5]

### III. THE CONTRACT CLAIMS ASSERTED IN THE UNDERLYING COMPLAINT

48. The Underlying Complaint asserts the following contract-based claims arising out of the Redevelopment Project:

a. **Count IV – Declaratory Judgment**, alleging that the Developer Defendants have "ignore[d] the Plaintiffs' lease provisions to conduct unauthorized construction and otherwise encroach on the Municipal Fish Market" and that future construction will violate their leases (*see* Ex. A, Dkt. 1-2, at ¶¶ 221-28);

b. **Count V – Breach of Lease (Specific Performance & Injunctive Relief)**, seeking an order requiring modifications to access, traffic, and parking plans, and requiring the Developer Defendants to raze buildings already constructed on the Common Area and to install permanent access to the Fish Market (*see id*. at ¶¶ 229-43);

c. **Count VI –Breach of Lease (Damages)**, alleging that the Developer Defendants' injurious lease breaches were "intentional," and that the Developer Defendants' "willful misconduct" resulted in damages (*see id*. at ¶¶ 244-51);

d. **Count VII – Breach of Covenant of Good Faith & Fair Dealing**, alleging that the Developer Defendants have "engag[ed] in a pattern of harassment" and "willfully ***breach[ed] the express lease terms***" (*see id*. at ¶¶ 252-58) (emphasis added);

---

[5] The Underlying Complaint does not use the word "negligent" or any of its variants to refer to the conduct of the Developer Defendants.

e. **Count VIII – Trespass & Conversion**, alleging that that the Developer Defendants' disruptive conduct has been "outrageous and malicious, wanton, reckless, or in willful disregard" for their rights, and seeking compensatory and punitive damages arising out of the impact of the Redevelopment Project to their businesses (*see id*. at ¶¶ 259-66);

f. **Count IX – Nuisance**, alleging that that the Developer Defendants' disruptive conduct has been "outrageous and malicious, wanton, reckless, or in willful disregard" for their rights (*see id*. at ¶¶ 267-73);

g. **Count X – Tortious Interference with Prospective Business Advantage**, alleging that they were harmed by the Developer Defendants' "intentional actions in encroaching onto the property, breaching [their] leases, blocking customer access and parking, and harassing [the Underlying Plaintiffs] and their customers" (*see id*. at ¶¶ 274-82); and

h. **Count XI – Unjust Enrichment**, alleging that that the Developer Defendants' disruptive conduct has been "outrageous and malicious, wanton, reckless, or in willful disregard" for their rights, and alleging that the Developer Defendants have received an undue benefit by moving forward with the Redevelopment Project, allowing the Developer Defendants to obtain windfall profits (*see id*. at ¶¶ 283-90).

## IV. ROCKHILL AGREES TO PROVIDE A CONDITIONAL DEFENSE WITH RESPECT TO THE WHARF SUIT PURSUANT TO A COMPLETE RESERVATION OF RIGHTS

49. On or about October 9, 2015, Rockhill agreed to defend HMW and WHRL (the only defendants named in the Wharf Suit at that time) pursuant to a complete reservation of rights. A copy of Rockhill's October 9, 2015 reservation of rights (the "October 2015 ROR") is attached to Rockhill's Complaint as Exhibit E (Dkt. 1-6).

50. Rockhill's October 2015 ROR stated in part:

a) "[W]e are proceeding under a Reservation of Rights…No act by a Rockhill representative while investigating…or defending the Lawsuit should be construed as waiving any company rights. Rockhill reserves its rights under the Policy to deny coverage[.]" *Id*. at 2 (emphasis added).

b) "Based on the foregoing, Rockhill will be handling the defense…under a full Reservation of Rights and without prejudice." *Id*. at 8.

c) "At this time, we are providing…a defense of the Lawsuit, but we reserve the right to withdraw from that defense if and when it becomes appropriate." *Id*.

      d)  "Neither this letter, nor any act, past or future, by a representative of Rockhill should be construed to be a waiver…On the contrary, we specifically reserve our right to rely upon the Policy language and to deny coverage[.]" *Id.* at 8-9.

51.     On or about February 27, 2017, after the current landlord, Fish Market REIT, joined the Wharf Suit, Rockhill supplemented its prior reservation of rights, denying coverage for Fish Market REIT because it was created after the termination of the Rockhill Policy, and because the Rockhill Policy does not otherwise extend insured status to Fish Market REIT. *See* Rockhill's February 27, 2017 supplemental reservation of rights, attached to Rockhill's Complaint as Exhibit F (Dkt. 1-7), at 2, 8.

52.     On January 15, 2018 and February 16, 2018, Rockhill issued additional correspondence to the current landlord, Fish Market REIT, reiterating that it does not qualify as an insured under the Rockhill Policy, and requesting that Fish Market REIT contribute fifty percent (50%) of all defense costs incurred by Rockhill since Fish Market REIT's inclusion in the Wharf Suit on February 13, 2017. *See* Rockhill's January 15, 2018 and February 16, 2018 letters to Fish Market REIT, attached to Rockhill's Complaint as Exhibits G and H (Dkts. 1-8 and 1-9).

## **THE ROCKHILL POLICY**

53.     Rockhill issued Commercial General Liability (CGL) policy no. GENL009195-00 to WHRL, HSW and various other Named Insureds for the period April 23, 2014 (the same day that the District assigned the Underlying Plaintiffs' leases to WHRL) and terminating on April 23, 2015 (the "Rockhill Policy").  A copy of the Rockhill Policy is attached to Rockhill's Complaint as Exhibit I (Dkt. 1-10).

54.     During the application process, one or more officers, employees, agents, brokers, or other affiliates of the Developer Defendants represented to Rockhill that the Developer

Defendants would be covered with respect to the Redevelopment Project under a Contractor Controlled Insurance Program ("CCIP") providing limits of approximately $200 million, while Rockhill would provide the coverage for lessor's risk only.

55.    The differentiation between development risks not covered by Rockhill and lessor's risk was ultimately memorialized in the Rockhill Policy, which contains a "Classification Limitation Endorsement," form no. RHIC 1186 02/12, providing: "This insurance applies only to locations and operations that are described under 'business description'…on the Declarations page…of this policy…If any operation(s) and/or location(s) are not so described, they are not covered hereunder." Ex. I (Dkt. 1-10) at RHIC000024.  The Rockhill Policy lists the insureds' "Business Description" as "Lessor's Risk." *Id*. at RHIC000005.

56.    The Rockhill Policy also notes that certain parking areas were covered, but for "lessor's risk only," and that certain non-occupied areas were covered, but for "lessor's risk only." *Id*. at RHIC000018.

57.    Additionally, the Rockhill Policy contains a "Limitation of Coverage to Designated Premises or Project" endorsement, form no. CG 21 44 07 98, which provides an option for the insured to designate a specific development project to be covered for "personal and advertising injury." *See id*. at RHIC000056.  Under "Project," the Schedule of the "Limitation of Coverage to Designated Premises or Project" endorsement is blank and does not identify any development or construction project. *See id*.

58.    The Rockhill Policy provides CGL coverage under form no. CG 00 01 12 04, which provides, in relevant part, as follows:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

Various provisions in this policy restrict coverage.  Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy.  The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section **II** – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V** – Definitions.

### SECTION I - COVERAGES

\*       \*       \*

### COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1.    **Insuring Agreement**

   **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply.  We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.

\*       \*       \*

   **b.**    This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

*Id*. at RHIC000029-30.

   59.    Insofar as relevant herein, the Rockhill Policy contains the following exclusions:

2.    **Exclusions**

   This insurance does not apply to:

   **a.**    **Knowing Violation Of Rights Of Another**

      "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

16

\*       \*       \*

  **e.**  **Contractual Liability**

    "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

  **f.**  **Breach Of Contract**

    "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

\*       \*       \*

*Id*. at RHIC000030.

  60.  Insofar as relevant herein, the Rockhill Policy contains the following provisions relating to which entities qualify as insureds under the Rockhill Policy:

**SECTION II – WHO IS AN INSURED**

  **1.**  If you are designated in the Declarations as:

\*       \*       \*

  **b.**  A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

  **c.**  A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insured, but only with respect to their duties as your managers.

\*       \*       \*

  No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

\*       \*       \*

*Id*. at RHIC000032-33.

17

61.    Insofar as relevant herein, the Rockhill Policy contains the following definition:

**SECTION V – DEFINITIONS**

\*        \*        \*

14.    "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.**    False arrest, detention or imprisonment;

**b**.    Malicious prosecution;

**c**.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d**.    Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e**.    Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f**.    The use of another's advertising idea in your "advertisement"; or

**g**.    Infringing upon another's copyright, trade dress or slogan in your "advertisement".

\*        \*        \*

*Id*. at RHIC000038.

62.    The Rockhill Policy contains an endorsement entitled "Breach of Contract Exclusion," form no. RHIC 1203 (6/12), which provides:

This insurance does not apply, nor do we have a duty to defend any claim or 'suit' for…'personal and advertising injury' arising directly or indirectly out of the following:

**a.**    Breach of express or implied contract;

**b.**    Breach of express or implied warranty;

**c.**    Fraud or misrepresentation regarding the formation, terms or performance of a contract; or

18

**d.**    Libel, slander or defamation arising out of or within the contractual relationship.

*        *        *

*Id*. at RHIC000023.

63.    The Rockhill Policy contains a "Named Insured Endorsement," form no. RHIC 1080 (1/07), which amends the Named Insured on the Declarations page to include certain additional Named Insureds, including HMW (a limited liability company), WHRL (a limited liability company), and WDJV (a limited partnership). *Id*. at RHIC000068.

64.    The Underlying Plaintiffs' current landlord, Fish Market REIT, is not listed in the Rockhill Policy's Declarations as a Named Insured, nor is it listed in the Rockhill Policy's "Named Insured Endorsement," form no. RHIC 1080 (1/07). *See id*.

65.    The Rockhill Policy's standard "other insurance" provisions provide:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

*        *        *

**4.  Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

**a.  Primary Insurance**

This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.

**b.  Excess Insurance**

This insurance is excess over:

**(1)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

19

    **(a)** That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

    **(b)** That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

    **(c)** That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

    **(d)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

  **(2)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

When this insurance is excess, we will have no duty under Coverage A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

*Id*. at RHIC000034-35.

66. The Rockhill Policy also contains an "Independent Contractor Insurance Agreement" endorsement, which amends Section IV and provides that the Rockhill Policy is "excess over any other insurance available to [the insureds] as an Additional Insured from any independent contractor or subcontractor ***or on any other basis***, whether such insurance is primary, excess or contingent…(4) [i]f the loss arises out of work performed for you or on your behalf…by an independent contractor or subcontractor." *Id*. at RHIC000055 (emphasis added).

67. The Rockhill Policy also contains the following "cooperation" provisions:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

*      *      *

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

*       *       *

    **c.** You and any other involved insured must:

*       *       *

        **(2)** Authorize us to obtain records and other information;

        **(3)** Cooperate with us in the investigation and settlement of the claim or defense against the "suit"; any

        **(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

*Id*. at RHIC000034.

## <u>THE DEVELOPER DEFENDANTS' FAILURES TO COOPERATE WITH ROCKHILL'S REQUESTS RELATING TO OTHER INSURANCE</u>

68.    Rockhill's October 2015 ROR to the Developer Defendants stated in part:

If [the Developer Defendants] or any of the other defendants [have] any other liability insurance policies, ***please let us know***. We also strongly suggest that [the Developer Defendants] ***report this claim to other insurers***, even if they think those policies would not apply to this claim. Let those insurers review the facts [and] decide whether their coverage applies.

Ex. E (Dkt. 1-6) at 9 (emphasis added).

69.    At no time after receiving Rockhill's October 2015 ROR did the Developer Defendants report the Wharf Suit or the underlying claims pled therein to any other insurers, including but not limited to Zurich.

70.    At no time after receiving Rockhill's October 2015 ROR did the Developer Defendants request that any other insurer defend them in the Wharf Suit, including but not limited to Zurich.

71.    Prior to December 21, 2017, Rockhill requested that the Developer Defendants provide copies of any other Commercial General Liability policies that might provide coverage

21

for the Redevelopment Project, particularly coverage for the construction activities alleged in the Underlying Complaint to have disrupted the Underlying Plaintiffs' businesses and thus given rise to the Wharf Suit.

72.    On December 21, 2017 (over two years before the Developer Defendants would produce the policy issued by Zurich to the design-builder/contractor, Clark), counsel for Rockhill and the Developer Defendants had the following email exchange (attached hereto, with unrelated and/or confidential sections redacted, as Exhibit 3):

> Adam Fleischer, counsel for Rockhill: "Michael- I am out of the country this week, but wanted to just check in on this. Have you provided…the previously requested professional liability policies for the developer as well as the tender correspondence back and forth with the carrier[.]"  Ex. 3 at 2-3.

> Michael McNamara, counsel for the Developer Defendants: "I checked and the developer defendants don't have professional liability policies."  *Id*. at 2.

> Fleischer: "[I]t seems impossible that a $2 billion development is undergoing construction with no insurance. They have to have coverage for disputes over the plans? Maybe it is called general liability or contractors liability coverage and not professional liability, but there has got to be coverage of some sort that needs to be notified here."  *Id*. at 1-2.

> McNamara: "The developer has insurance. They have GL insurance. They have builders risk policies for property under construction. And they have property insurance for property where construction is finished. They have other policies as well. But not professional liability. And I don't know why they would. I've never heard of developers buying that."  *Id*. at 1.

> Fleischer: "Great thank you. Please send us the GL and builders risk policies. The builders' GL policy should apply here much sooner than the landlord's policy, and the same with the builders risk coverage. We won't contact any insurers or do anything with the info until after we speak to you on Wednesday."  *Id*.

> McNamara: "I'll see what I can find over the holidays. When you say the 'builders' gl, who is the builder? The Whites aren't suing Balfour Beatty. The builders risk is a first party property policy. I don't know why that would apply."  *Id*.

73.    By letter dated December 28, 2017, Rockhill reiterated its request that the Developer Defendants provide "*copies of any liability insurance policies issued to the [Developer Defendants] for the period beginning with the first construction on the Redevelopment Project through the present*."   *See* Rockhill's December 28, 2017 letter, attached hereto (with unrelated and/or confidential sections redacted) as Exhibit 4, at 2 (emphasis added).

74.    Rockhill's December 28, 2017 letter prompted the following email exchange between counsel for Rockhill and counsel for the Developer Defendants (attached hereto, with unrelated and/or confidential sections redacted, as Exhibit 5):

> Michael McNamara, counsel for the Developer Defendants: "I told you already that the insureds here have no professional liability policies."  Ex. 5 at 3.

> Adam Fleischer, counsel for Rockhill: "And the insureds have no other liability policies that would cover the subject period?  The only policy the insureds have that applies to this development project is an $11,000 [premium] lessor's policy?  It may be the case that they chose to self-insure, *but I just don't want any misunderstanding that policies exist, but because they don't say 'professional liability' on them, then the insureds are not providing them because someone believed we didn't ask the correct questions*."   *Id*. at 2 (emphasis added).

> McNamara: "I'll ask again, but I don't think there are any other liability policies.  If memory serves, there were CIPs for the various construction projects that were part of the overall project, and those would include GL policies.  But none of them would extend to the Fish Market."  *Id*.

> Fleischer: "If the CIP program included GL policies, I would guess that those GL policies would apply to the construction activities within the alleged common area that are the exact subject of the [Underlying Plaintiffs'] complaints, which is why it is so important to State Auto to at least see those policies."  *Id*.

> Justin Seigler, counsel for Rockhill: "To clarify: as contemplated in today's letter, we're interested in any liability policy (including but not limited to any GL policies, CIP or otherwise) issued in connection with construction on the Wharf, including the common area, dating back to the beginning of the project."  *Id*. at 1.

75.     On January 3, 2018, Rockhill again reiterated that each construction activity complained of by the Underlying Plaintiffs in the Wharf Suit should and must be covered by other insurance, and Rockhill again requested copies of any such policies for Rockhill's review. *See* Rockhill's January 3, 2018 email, attached hereto (with unrelated and/or confidential sections redacted) as Exhibit 6, at 2.

76.     By letter dated January 15, 2018 (still over two years before the Developer Defendants would produce the policy issued by Zurich to Clark), Rockhill again requested copies of any other liability policies issued to any party that may provide coverage to the Developer Defendants in the Wharf Suit. *See* Rockhill's January 15, 2018 letter, attached hereto (with unrelated and/or confidential sections redacted) as Exhibit 7.  Rockhill specifically noted:

> The Rockhill policy also contains the following 'cooperation clause' that provides under Section IV.2.c.(3): "You [the named insured] and any other involved insured must…[c]ooperate with us in the investigation or settlement of the claim or defense against the "suit".  As such, Rockhill is entitled to copies of these policies, and its insureds are bound to cooperate in these efforts.  ***The insured's continued delay in responding to Rockhill's reasonable request for these policies has and will continue to result in prejudice to Rockhill, given that defense costs continue to flow 100% to Rockhill, rather than those other carriers that likely have a primary defense obligation***.

Ex. 7 at 2 (emphasis added).

77.     In response, the Developers provided Rockhill with an Owners & Contractors Protective Liability policy that incepted on October 13, 2016, over ***two years*** after the Redevelopment Project began in the spring of 2014.

78.     On February 16, 2018, Rockhill acknowledged receipt of the 2016-2018 OCIP policy and requested any policies in effect during the period 2014 to 2016, as the Redevelopment Project began in 2014 and the Wharf Suit was filed in 2015.  A copy of Rockhill's February 16,

2018 letter is attached hereto (with unrelated and/or confidential sections redacted) as Exhibit 8.

Rockhill explained:

> While we appreciate you providing the [2016-2018 OCIP] policy, we note that it
> incepted over two years after the developer defendants began the construction at
> issue in the Wharf Suit.  Please provide us with copies of any other liability
> policies that may have provided coverage for any of your clients in the Wharf Suit
> during the 2014 to 2016 period…Rockhill continues to reserve all rights under the
> "other insurance" and cooperation clauses of its policy.

*Id*. at 1-2.

79.    With the Developer Defendants having still not provided any liability policy
applying to the construction activities alleged in the Wharf Suit, Rockhill filed its Complaint in
this action on September 20, 2018.  *See* Compl. (Dkt. 1).

80.    On October 24, 2018**,** Rockhill served the design-builder/contractor, Clark, with a
subpoena calling for, *inter alia*, "any policies of liability insurance that list any of the [Developer
Defendants], or any of their affiliates, as insureds (whether ***Named Insureds***, Additional
Insureds, or otherwise)" with respect to construction on the Redevelopment Project from January
1, 2014 through the present.  *See* Rockhill's subpoena, including rider and affidavit of service,
attached hereto as Exhibit 9, at 6 of 6 (emphasis added).

81.    On November 6, 2018, the Developer Defendants' corporate counsel, the
Pillsbury firm, responded to Rockhill's October 24, 2018 subpoena on behalf of Clark.  A copy
of Clark's response to Rockhill's subpoena is attached hereto as Exhibit 10.   Clark objected to
production of the requested policy because the request was purportedly irrelevant to any claim or
defense in this action (to which Clark was not a party).  *See id.* at 1.

82.    On November 13, 2018, Rockhill responded to Clark's counsel at Pillsbury and
explained the relevance of the requested documents:

> The Developers contend that Rockhill alone owes a duty to defend them with regard to the Wharf Suit. Rockhill contends that the Wharf Suit likely implicates coverage issued for the construction activities on the project, not the lessor's risk coverage issued by Rockhill. Rockhill also alleges that, in placing the lessor's risk coverage with Rockhill, the Developer Defendants or their broker represented the existence of project-specific insurance to cover risks arising out of the construction activities. The documents called for in the subpoena should shed light on these issues…

*See* Rockhill's November 13, 2018 letter, attached hereto as Exhibit 11, at 1-2.

83.    On November 16, 2018, Pillsbury responded on behalf of Clark and refused to produce any documents in response to Rockhill's subpoena. A copy of Clark's November 16, 2018 letter is attached hereto as Exhibit 12.

84.    In its November 16, 2018 letter, Clark based its refusal to produce documents on the non-sequitur that the Developer Defendants would not be entitled to "***additional insured*** liability insurance coverage" under any policy issued to Clark, despite the fact that Rockhill's October 24, 2018 subpoena and November 13, 2018 letter requested policies on which the Developer Defendants were also "***Named Insureds***." *See* Ex. 12 at 1, Ex. 9 at 6 of 6, and Ex. 11 at 2 (all emphasis added).

85.    Also on November 16, 2018**,** the Developer Defendants' filed their Answer in this suit ***denying*** Rockhill's allegation that "one or more of the Developers were ***listed as insureds*** under a policy or policies of liability insurance—not including any policies issued by Rockhill— ***in effect during the initial construction of the Redevelopment Project in 2014 and 2015***." *See* Compl. (Dkt. 1) and Ans. (Dkt. 17) at ¶ 64 (emphasis added).

86.    On September 30, 2019, this Court ruled on Rockhill's Motion for Judgment on the Pleadings, holding that Rockhill owes a duty to defend the Insured Developer Defendants (but not Fish Market REIT) under the same Coverage B language that would ultimately be found

in the policy issued by Zurich to Clark and produced by the Developer Defendants exactly six months later.  *See* Mem. Opinion (Dkt. 36).

87.     On January 24, 2020, Rockhill issued written discovery to the Developer Defendants to again request any liability insurance policies potentially applicable to the construction activities alleged in the Wharf Suit.  A copy of Rockhill's First Set of Requests for Production is attached hereto as Exhibit 13.  *See* Ex. 13 at Request Nos. 1-2, 8-11.

88.     On March 30, 2020, the Developer Defendants produced the policy issued by Zurich to Clark and ***four of the Developer Defendants as Named Insureds*** (the "Zurich Policy"), which specifically applies to the Redevelopment Project and which contains the same Coverage B language as advocated and litigated by the Developer Defendants as a basis for Rockhill's duty to defend.  *See* Ex. 1 hereto.

## THE ZURICH POLICY

89.     Zurich issued policy no. GLO 9156378-00 to its first named insured, Clark, for the period January 1, 2014 through January 1, 2016, later extended through August 28, 2018. Ex. 1 at Developers_00000006, 81.

90.     Like the Rockhill Policy, the Zurich Policy includes Coverage B and provides: "We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies."  *Id.* at Developers_00000033.

91.     The Zurich Policy also provides: "We will have the right and duty to defend the insured against any 'suit' seeking those damages."  *Id.*

92.     Section II of the Zurich Policy provides that "[i]f you are designated in the Declarations as…[a] limited liability company, you are an insured," "[y]our members are also insureds," and "[y]our managers are insureds."  *Id.* at Developers_00000036.

93.     The Zurich Policy defines "you" as "the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy."  *Id.* at Developers_00000028.

94.     The Declarations refer to Clark as Named Insured and also state "(SEE NAMED INSURED ENDT)."  *Id.* at Developers_00000006.

95.     The Zurich Policy's Named Insured endorsement modifies the Declarations and specifically lists HSW, WDGPJV, WHR, and WHRL as Named Insureds.  *Id.* at Developers_00000084.

96.     HMW is (or was at the time the Zurich Policy was in effect) a manager and/or member of HSW.  *See*, *e.g.*, Ex. A (Dkt. 1-2) at ¶ 32(b)(ii).

97.     Therefore, while HMW is not specifically listed as a Named Insured under the Zurich Policy, it qualifies as an insured under Section II as a member and/or manager of a Named Insured.  *See* Ex. 1 at Developers_00000036.

98.     Like the Rockhill Policy, Coverage B of the Zurich Policy provides: "This insurance applies to 'personal and advertising injury' caused by an offense arising out of your business but only if the offense was committed…during the policy period."  *Id.* at Developers_00000033.

99.     Like the Rockhill Policy, the definition of "personal and advertising injury" includes the same provision briefed by the parties on Rockhill's Motion for Judgment on the Pleadings in this action (Dkt. 24-1), which this Court concluded gives rise to a duty to defend

(*see* Dkt. 36), particularly: "wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor[.]" *Id*. at Developers_00000041.

100.    The Zurich Policy contains an endorsement entitled "Limitation of Coverage to Designated Project(s)," which provides that "[t]he insurance provided by this policy applies only to…'personal and advertising injury'…arising out of the 'designated project(s) shown in the SCHEDULE above." *Id*. at Developers_00000060.

101.    The endorsement's Schedule states under "Project": "All construction operations associated with the project(s) endorsed on to this policy via the Designated Project – Declarations endorsement, or the following project(s) to be included in the Program." *Id*.  Under "Designated Project(s)," the endorsement states: "SCHEDULE ON FILE." *Id*.

102.    A "Designated Project – Declarations" endorsement added by change endorsement to the Zurich Policy lists "The Wharf – 113306" project at 800 Maine Ave. SW, Washington, D.C., with a project start date of March 3, 2014, a contract start date of April 14, 2014, and a tentative project and contract end date of October 15, 2017.  *See id*. at Developers_00000080-82.

103.    Under "Project Description," the endorsement states: "Design build construction of site improvements, garage, 500 unit apartment building and core and shell office building." *Id*. at Developers_00000081.

104.    The "Limitation of Coverage to Designated Project(s)" endorsement does not restrict coverage to the specific address listed in the "Designated Project – Declarations" endorsement, and instead more broadly defines "Designated Project" as:

> The project shown in this SCHEDULE, including operations on and off the project site or location that are necessary or incidental to the project as described

in contract documents. "Designated Project" includes the work site(s) associated with such "designated project(s)" and any offsite staging areas, as long as they are dedicated solely to the "designated project(s)". Also included are those areas immediately adjacent to the "designated projects", including boundaries of local streets or public easement, in which the enrolled subcontractors at any tier perform work under their respective contracts.

*Id*. at Developers_00000060.

105.    The Zurich Policy's "other insurance" provisions are materially identical to the Rockhill Policy's standard "other insurance" provision alleged at paragraph 65 above, and provide:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

\*        \*        \*

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

**a.  Primary Insurance**

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

**b.  Excess Insurance**

**(1)** This insurance is excess over:

**(a)** Any of the other insurance, whether primary, excess, contingent or on any other basis:

**(i)**  That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

**(ii)**  That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

**(iii)**  That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

30

  **(iv)** If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of Section **I** – Coverage **A** – Bodily Injury And Property Damage Liability.

 **(b)** Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

**(2)** When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

*Id*. at Developers_00000038.

106. The Zurich Policy also contains the following "late notice" provision:

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

\*  \*  \*

**4. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

 **a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim….

 **b.** If a claim is made or "suit" is brought against any insured, you must:

  **(1)** Immediately record the specifics of the claim or "suit" and the date received; and

  **(2)** Notify us as soon as practicable.

 You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

*Id*. at Developers_00000037-38.

107. The Zurich Policy includes a "Notice of Occurrence" endorsement providing: "If you report an 'occurrence', offense, claim or 'suit' to another insurer and later discover that you

should have reported the 'occurrence', offense, claim or 'suit' to us, we will not consider your failure to report the 'occurrence', offense, claim or 'suit' earlier a violation of your duties…as long as you give us notice as soon are you aware that the 'occurrence', offense, claim or 'suit' should have been reported to us." *Id*. at Developers_00000044.

## NOTICE TO ZURICH & ITS DENIAL OF THE TENDER

108.    On March 31, 2020, Rockhill requested that the Developer Defendants tender their defense in the Wharf Suit to Zurich on a primary and non-contributory basis.

109.    On April 5, 2020, the Developer Defendants refused to tender their defense to Zurich in the Wharf Suit.

110.    On April 22, 2020, Rockhill notified Zurich of the Wharf Suit and demanded that it defend the Developer Defendants on a primary and non-contributory basis.

111.    By letter dated August 12, 2020, Zurich declined to participate in the defense of the Developer Defendants in the Wharf Suit.  A copy of Zurich's August 12, 2020 letter is attached hereto as Exhibit 14.  As the basis for its determination, Zurich claimed that it owes no coverage because this Court already determined in September 2019 that Rockhill has a duty to defend under the terms of the Rockhill Policy, and because the Developer Defendants had not timely tendered their defense to Zurich or even notified Zurich of the Wharf Suit, as required by the Zurich Policy.  *Id*. at 4-6, 8-9.

## COUNT I
### NO DUTY TO DEFEND OR INDEMNIFY THE DEVELOPER DEFENDANTS & RECOUPMENT OF DEFENSE COSTS (RESOLVED BY THE COURT'S SEPT. 30, 2019 ORDER, DKT. 36, & PLED FOR APPEAL PURPOSES ONLY)

112.    Rockhill restates and incorporates the allegations of paragraphs 1 through 111, above, as if set forth fully herein.

### A. DEVELOPER DISPUTES ARE OUTSIDE THE POLICY'S CLASSIFICATION LIMITATION

113.   Considering the "Classification Limitation" endorsement, "Limitation of Coverage to Designated Premises or Project" endorsement, and "Location Schedule" together, the Rockhill Policy only covers Rockhill's insureds for "lessor's risk" "operations" in connection with the "ownership, maintenance or use" of the Fish Market or "operations necessary or incidental" to the Fish Market.

114.   The Rockhill Policy does not cover risks that its insureds may undertake as real estate developers, including construction risks, which WHRL and/or its affiliates represented to Rockhill during underwriting would be addressed under a separate $200 million policy or tower of insurance for the construction of the Redevelopment Project.

115.   The gravamen of the Underlying Plaintiffs' allegations of liability against the Developer Defendants is that the Developer Defendants' planning, design, and construction activities in connection with the Redevelopment Project harmed the Underlying Plaintiffs' businesses.  *See generally* Ex. A.

116.   As such, the Underlying Plaintiffs' allegations of liability against the Developer Defendants are not based on "lessor's risk" "operations" in connection with the "ownership, maintenance or use" of the Fish Market or "operations necessary or incidental" to the Fish Market.

117.   Rather, the Underlying Complaint's allegations of liability against the Developer Defendants are based on developer's risk operations in connection with a specific construction project, which is not covered under the Rockhill Policy.

33

**B.  THE WHARF SUIT DOES NOT ALLEGE "PERSONAL & ADVERTISING INJURY"**

118.    Additionally, in order for the Rockhill Policy "personal and advertising injury" coverage for "invasion of the right of private occupancy" to apply, the underlying claim must be brought by a natural "person" and predicated on a right of private occupancy or possessory interest held by the underlying claimant, and the offense must have been "committed by or on behalf of" the landlord or lessor.

119.    Each of the Underlying Plaintiffs is a corporation, and none of the Underlying Plaintiffs is a natural person, and therefore the "personal injury" coverage for "invasion of the right of private occupancy" of a "person" does not apply.

120.    Additionally, the Wharf Suit's allegations of liability against the Developer Defendants arise out of alleged encroachment to the Common Area of the Fish Market, and by definition and as a matter of law a tenant does not have a right of private occupancy or possessory interest in a common area.

121.    Also, given the gravamen of the Underlying Complaint, the Underlying Plaintiffs' allegations of liability against the Developer Defendants are not based on any act "committed by or on behalf of" the landlord of the Fish Market in its capacity as such, but instead on acts "committed by or on behalf of" the Developer Defendants in their capacity as developers.

**C.  THE POLICY EXCLUDES CONTRACTUAL LEASE DISPUTES**

122.    To the extent that the Underlying Complaint alleges "personal and advertising injury," the gravamen of the Wharf Suit derives directly from alleged breaches of the commercial lease agreements, which are excluded claims under the Rockhill Policy pursuant to the Breach of Contract Exclusion Endorsement, as well as the "personal and advertising injury"

exclusions for Contractual Liability and Breach of Contract.  *See generally* Ex. A; Ex. I at RHIC000023, RHIC000030.

**D.  THE POLICY EXCLUDES KNOWING VIOLATIONS OF RIGHTS**

123.   To the extent that the Underlying Complaint alleges "personal and advertising injury," it alleges throughout that the Underlying Plaintiffs' damages were caused by the Developer Defendants' conspiracy to violate the Underlying Plaintiffs' commercial leases, destroy their businesses, and oust them from the leased premises in order to proceed unhindered with the Redevelopment Project, thus falling within the Rockhill Policies' exclusion for "Knowing Violation of Rights of Another."  *See generally* Ex. A; Ex. I at RHIC000030.

124.   For the foregoing reasons, Rockhill does not owe a duty to defend or indemnify the Developer Defendants with respect to the Underlying Complaint in the Wharf Suit, and is entitled to recoupment of attorneys' fees, costs, and expenses paid by Rockhill in defense of the Wharf Suit.

WHEREFORE, the Plaintiff, ROCKHILL INSURANCE COMPANY, prays that this Honorable Court enter an order finding and declaring that it does not owe a duty to defend or indemnify the Defendants, WHARF FISH MARKET REIT LEASEHOLDER, LLC,  WHARF DISTRICT GP JOINT VENTURE, LLC, WHARF HORIZONTAL REIT, LLC,  HOFFMAN-MADISON WATERFRONT, LLC, WHARF HORIZONTAL REIT LEASEHOLDER, LLC, HOFFMAN-STRUEVER WATERFRONT, LLC, and WHARF DISTRICT JOINT VENTURE LP, LLC, under the Rockhill Policy with respect to the Underlying Complaint in the Wharf Suit, that Rockhill is entitled to recoupment of attorneys' fees, costs, and expenses incurred in defense of non-covered claims, and for such other and further relief as this Court deems fair and just under the circumstances.

## COUNT II
### RIGHT TO EQUITABLE ALLOCATION BETWEEN
### POTENTIALLY-COVERED & NON-COVERED DEFENSE COSTS

125.    Rockhill restates and incorporates the allegations of paragraphs 1 through 124, above, as if set forth fully herein.

126.    In addition and in the alternative to Count I, and to the extent that Rockhill does owe a continuing duty to defend one or more of the Developer Defendants with respect to the Underlying Complaint in the Wharf Suit, Rockhill is entitled to recover those significant portions of its defense costs that are incurred in connection with non-covered claims and issues, along the following lines, pled in the alternative and without waiver to any additional grounds for allocation:

a. **Lease Renegotiation & Drafting:** Defense counsel has incurred substantial attorneys' fees and other expenses in an effort to renegotiate and redraft the Underlying Plaintiffs' leases. These costs are incurred on behalf of the current landlord, Fish Market REIT, which is not an insured under the Rockhill Policy, and otherwise fall within the Policy's contract exclusions.

b. **Expert Discovery of Development Modifications:** Defense counsel has incurred substantial attorneys' fees and other expenses to address proposed changes to the Redevelopment, including plans relating to parking feasibility, loading, sight lines, traffic, and other design issues. These costs are incurred on behalf of the current landlord, Fish Market REIT, which is not an insured under the Rockhill Policy, do not fall within the lessor's risk of the Policy, and otherwise fall within the Policy's contract exclusions.

c. **Discovery Regarding Wholesaling Activities:** Defense counsel has incurred substantial attorneys' fees and other expenses in an effort to establish the Underlying Plaintiffs' seafood wholesaling activities on the leased premises. These costly areas of inquiry are directly related to the Developer Defendants' affirmative claims that the Underlying Plaintiffs' have breached their leases and should be evicted. These costs are incurred on behalf of the current landlord, Fish Market REIT, which is not an insured under the Rockhill Policy, and are not otherwise associated with any potentially-covered claim.

d. **Redevelopment Oversight & Coordination:** Defense counsel has incurred substantial attorneys' fees and other expenses to oversee, coordinate, manage, and administer the Developer Defendants' responses to complaints arising out of the Redevelopment Project, including issues relating to a sunken barge near the

36

Underlying Plaintiffs' barges, the disposal of water from the construction site near the barges (which was recently pled in a Motion for Temporary Restraining Order in the Wharf Suit), the location of construction garbage receptacles and construction fencing near or on the Common Area of the Fish Market, potential problems with animals at the Fish Market, and other day-to-day development issues. These costs are incurred on behalf of the current landlord, Fish Market REIT, which is not an insured under the Rockhill Policy, and the Developer Defendants (in their capacity as such), not to defend against potentially-covered claims arising during Rockhill's coverage period.

e. **<u>Other Non-Covered Costs</u>:** To the extent that defense counsel continues to bill Rockhill for any other costs that may reasonably be identified and allocated to the defense of non-covered claims or parties, or to the non-covered prosecution of affirmative claims, or to the day-to-day operation of the Developer Defendants' or landlord's businesses, those costs are subject to recoupment by Rockhill.

WHEREFORE, the Plaintiff, ROCKHILL INSURANCE COMPANY, prays that this Honorable Court enter an order finding and declaring that it is entitled to an equitable allocation between any potentially-covered defense costs and non-covered costs as set forth above, and for such other and further relief as this Court deems fair and just under the circumstances.

**<u>COUNT III</u>**
**NO DUTY TO DEFEND OR INDEMNIFY THE**
**NON-INSURED LANDLORD, FISH MARKET REIT, &**
**RECOUPMENT OF DEFENSE COSTS INCURRED ON ITS BEHALF**
**(PARTLY RESOLVED BY THE COURT'S**
**SEPT. 30, 2019 ORDER, DKT. 36)**

127. Rockhill restates and incorporates the allegations of paragraphs 1 through 126, above, as if set forth fully herein.

128. The Underlying Plaintiffs' current landlord, Fish Market REIT, was created and/or organized as a limited liability company *after* the termination of the Rockhill Policy occurred on April 23, 2015.

129. Fish Market REIT is not listed anywhere in the Rockhill Policy as a Named Insured. Likewise, Fish Market REIT was not a member, manager, or partner of HSW, HMW,

WHRL, WDJV, or any other entity listed in the Rockhill Policy's "Named Insured Endorsement" during the Rockhill Policy's effective period.

130.    As such, Fish Market REIT is not an "insured" under the Rockhill Policy with respect to its own conduct, or the conduct of any "insured" under the Rockhill Policy, with respect to the Wharf Suit.  *See* Mem. Opinion (Dkt. 36) (holding same).

131.    Moreover, because Section II of the Rockhill Policy provides that "[n]o person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations," none of the other Developer Defendants is covered with respect to Fish Market REIT's conduct.

132.    Since Fish Market REIT's voluntary joinder in the Wharf Suit in February 2017, Rockhill has paid substantial defense costs on behalf of the Developer Defendants in the Wharf Suit, including on behalf of Fish Market REIT subject to Rockhill's February 27, 2017 Supplemental Reservation of Rights (Ex. F).

133.    As of the date of filing this action, despite multiple requests (including but not limited to the letters attached to Rockhill's Complaint as Exhibits G and H, Dkts. 1-8 and 1-9), Fish Market REIT has not agreed to contribute any amount towards its own defense in the Wharf Suit.

134.    Because Fish Market REIT is not an insured under the Rockhill Polices, it was never entitled to a defense from Rockhill in connection with the Wharf Suit, and therefore Rockhill is entitled to reimbursement from Fish Market REIT for Fish Market REIT's equitable share of defense costs incurred since its addition to the Wharf Suit in February 2017.

135.    For the foregoing reasons, Rockhill requests that this Court order Fish Market REIT to reimburse Rockhill of its equitable share of all defense costs incurred since it was added

as a party to the Wharf Suit. To the extent that this Court finds that Rockhill has a continuing

duty to defend any of the other Developer Defendants with respect to the Underlying Complaint,

then this Court should further order as follows:

      a.  the current landlord, Fish Market REIT, must be defended by separate counsel of
           its own choosing and funding going forward; or

      b.  the current common defense counsel for the former and current landlords must
           establish separate billing files so that the costs of defending the current landlord,
           and of administering the lease and development obligations of the current
           landlord, may be billed to it, with costs common to the two landlords split
           between the two files.

WHEREFORE, the Plaintiff, ROCKHILL INSURANCE COMPANY, prays that this

Honorable Court enter an order finding and declaring that it does not owe a duty to defend or

indemnify the Defendant, WHARF FISH MARKET REIT LEASEHOLDER, LLC, under the

Rockhill Policy with respect to the Underlying Complaint in the Wharf Suit, that the Defendant

must reimburse the Plaintiff for defense costs incurred on the Defendant's behalf since its joinder

in the Wharf Suit as set forth herein above, that the Defendant must modify its legal

representation as set forth above in order to prevent it or its counsel from billing the Plaintiff for

its defense costs in the future, and for such other and further relief as this Court deems fair and

just under the circumstances.

## COUNT IV
### BREACH OF CONTRACT – "COOPERATION" & "OTHER INSURANCE" CLAUSES
### (AGAINST THE INSURED DEVELOPER DEFENDANTS)

136.    Rockhill restates and incorporates the allegations of paragraphs 1 through 135,

above, as if set forth fully herein.

137.    The Rockhill Policy is a binding and enforceable contract.

138.    Rockhill has performed all material obligations required for the enforcement of

Rockhill's insureds' contractual obligations under the terms of the Rockhill Policy, particularly

the obligations of HMW, HSW, WDGPJV, WDGPJV, WHR, and WHRL (collectively, the "Insured Developer Defendants").[6]

139.    The conditions set forth in Section IV of the Rockhill Policy are conditions precedent to coverage under the Rockhill Policy, and/or material terms of the Rockhill Policy.

140.    Specifically, Section IV(2) of the Rockhill Policy requires any "involved insured" to authorize Rockhill to obtain the documents that it needs in the handling of the claim, to cooperate with Rockhill in Rockhill's investigation and defense of the claim, and to assist Rockhill in enforcing any rights against organizations who may be liable to the involved insureds for claims to which Rockhill's insurance also applies.  *See* Ex. I to Compl. (Dkt. 1-10) at RHIC000034.

141.    Section IV(4) of the Rockhill Policy, and the Policy's "Independent Contractor Insurance Agreement" endorsement that modifies Section IV, require the insureds to cooperate in advising Rockhill as to whether any other "valid and collectible insurance is available to the insured" for a loss that Rockhill also covers.  *See id*. at RHIC000034-35; RHIC000055.  In the event that Rockhill is defending a suit, these provisions entitle Rockhill to the insureds' rights against any other insurers who have a duty to defend the insureds in such a suit.  This, too, requires the insureds to advise Rockhill in a timely fashion as to what other insurance is available for such a suit.

142.    The Zurich Policy constitutes such other valid and collectible insurance, given that: (a) the Wharf Suit alleges that construction activities taking place both on and off the Fish Market premises as part of the Redevelopment Project disrupted the Underlying Plaintiffs'

---

[6] The Insured Developer Defendants do not include Fish Market REIT, who this Court determined is not a Rockhill insured.  *See* Mem. Opinion (Dkt. 36).

40

businesses, interfered with their rights under the leases entered into with the Developer Defendants, and resulted in damages; (b) the Zurich Policy covers claims arising from the Redevelopment Project, including the construction activities alleged in the Wharf Suit; and (c) HSW, WDGPJV, WHR, WHRL, and HMW are insureds under the Zurich Policy.

143.    The Developer Defendants breached their obligations under the Rockhill Policy, including but not limited to those obligations under Sections IV(2) and IV(4) by:

a) failing to reveal the existence of the Zurich Policy in a timely fashion in response to Rockhill's October 2015 ROR, which requested that they advise if any of the Developer Defendants had other liability insurance in place to respond to the claims arising from the construction activities alleged in the Wharf Suit;

b) failing to report the Wharf Suit to other insurers, including Zurich, "even if they think those policies would not apply to this claim," as requested in Rockhill's October 2015 ROR and thereafter;

c) failing to reveal the existence of the Zurich Policy in a timely fashion in response to Rockhill's December 21, 2017 written request for "[t]he builders' GL policy[,] [which] should apply here much sooner than the landlord's policy";

d) failing to reveal the existence of the Zurich Policy in a timely fashion in response to Rockhill's December 28, 2017 written request for "copies of any liability insurance policies issued to the [Developer Defendants] for the period beginning with the first construction on the Redevelopment Project through the present";

e) failing to reveal the existence of the Zurich Policy in a timely fashion in response to Rockhill's January 3, 2018 written request for policies that might cover the complained-of construction activities;

f) failing to reveal the existence of the Zurich Policy in a timely fashion in response to Rockhill's January 15, 2018 written request for any other liability policies issued to any party that may provide coverage to the Developer Defendants in the Wharf Suit;

g) failing to reveal the existence of the Zurich Policy in a timely fashion in response to Rockhill's February 16, 2018 written request for "copies of any other liability policies that may have provided coverage for any of [Pillsbury's] clients in the Wharf Suit during the 2014 to 2016 period";

h) upon information and belief, coordinating the retention of counsel to oppose the subpoena served by Rockhill for insurance policies issued to Clark, the relevant

contractor responsible for the construction activities alleged in the Wharf Suit; and

i) refusing to tender their defense in the Wharf Suit to Zurich upon receiving Rockhill's March 31, 2020 request, and at all other relevant times prior to and after receiving that request.

144. As a direct and proximate result of the Developer Defendants' contractual breaches set forth above, Zurich disclaimed any duty to defend or indemnify the Developer Defendants with respect to the Wharf Suit because: (a) the Developer Defendants never tendered their defense to Zurich or otherwise provided timely notice of the Wharf Suit, as required by the Zurich Policy; and (b) this Court had already ruled that a different carrier, Rockhill, owed a duty to defend the Developer Defendants.

145. As a direct and proximate result of the above breaches of contract, Rockhill has been prejudiced in that it can no longer exercise its rights under the Rockhill Policy's "other insurance" provisions, including the "Independent Contractor Insurance Agreement" endorsement, which would have otherwise rendered the Rockhill Policy excess to the Zurich Policy or, at the very least, co-primary (*i.e.*, sharing 50%-50%) with the Zurich Policy.

146. As a direct and proximate result of the above breaches of the Rockhill Policy, Rockhill has suffered damages, including but not limited to the defense fees and costs incurred and paid on behalf of the Developer Defendants in the Wharf Suit, which Rockhill would not have been forced to incur had the Developer Defendants performed under the Rockhill Policy.

WHEREFORE, the Plaintiff, ROCKHILL INSURANCE COMPANY, prays that this Honorable Court enter an order finding and declaring that:

A. the Insured Developer Defendants breached the Rockhill Policy in one or more of the ways set forth above; and

B. Rockhill does not owe a duty to defend the Developer Defendants and is entitled to withdraw from the defense of all Developer Defendants in the Wharf Suit; and

C. Rockhill does not owe a duty to indemnify with respect to any judgment or settlement disposing of the Wharf Suit; and

D. to the extent the Zurich Policy would have provided a primary and non-contributory defense for the Developer Defendants, Rockhill is entitled to reimbursement of 100% of the defense fees and costs paid by Rockhill to Pillsbury since the operative breach of the Rockhill Policy; or

E. to the extent the Zurich Policy would have provided a co-primary defense for the Developer Defendants, Rockhill is entitled to reimbursement of 50% of the defense fees and costs paid by Rockhill to Pillsbury since the operative breach of the Rockhill Policy; and

F. Rockhill is entitled to other compensatory damages, prejudgment interest, attorneys' fees and costs, and such other and further relief as this Court deems fair and just under the circumstances, including but not limited to incidental and consequential damages.

## COUNT V
### BREACH OF THE IMPLIED DUTY OF GOOD FAITH & FAIR DEALING
### (AGAINST THE INSURED DEVELOPER DEFENDANTS)

147. Rockhill restates and incorporates the allegations of paragraphs 1 through 146, above, as if set forth fully herein.

148. The Rockhill Policy is a binding and enforceable contract.

149. Rockhill has performed all material obligations required for the enforcement of the Insured Developer Defendants' obligations under the terms of the Rockhill Policy.

150. The Insured Developer Defendants have a duty of good faith and fair dealing which prohibits them from taking any action that has the effect of frustrating, injuring, or destroying Rockhill's rights under the Rockhill Policy.

151. As set forth in Count IV above, the Insured Developer Defendants have engaged in a pattern of behavior and taken actions that breached their duty of good faith and fair dealing under the Rockhill Policy, and which frustrated, injured, and destroyed Rockhill's rights under the Rockhill Policy's "other insurance" provisions to share its defense obligations and any

arguable indemnity obligations with Zurich on either a primary and non-contributory basis, or on a co-primary basis.

152.     As a direct and proximate result of the Insured Developer Defendants' breaches of their duty of good faith and fair dealing, Rockhill has suffered damages, including but not limited to the defense fees and costs incurred and paid on behalf of the Developer Defendants in the Wharf Suit, which Rockhill would not have been forced to incur had the Developer Defendants not breached their duty of good faith and fair dealing under the Rockhill Policy.

WHEREFORE, the Plaintiff, ROCKHILL INSURANCE COMPANY, prays that this Honorable Court enter an order finding and declaring that:

A.  the Insured Developer Defendants breached their duty of good faith and fair dealing under the Rockhill Policy in one or more of the ways set forth above; and

B.  Rockhill does not owe a duty to defend the Developer Defendants and is entitled to withdraw from the defense of all Developer Defendants in the Wharf Suit; and

C.  Rockhill does not owe a duty to indemnify with respect to any judgment or settlement disposing of the Wharf Suit; and

D.  to the extent the Zurich Policy would have provided a primary and non-contributory defense for the Developer Defendants, Rockhill is entitled to reimbursement of 100% of the defense fees and costs paid by Rockhill to Pillsbury since the operative breach of the duty of good faith and fair dealing; or

E.  to the extent the Zurich Policy would have provided a co-primary defense for the Developer Defendants, Rockhill is entitled to reimbursement of 50% of the defense fees and costs paid by Rockhill to Pillsbury since the operative breach of the duty of good faith and fair dealing; and

F.  Rockhill is entitled to other compensatory damages, prejudgment interest, attorneys' fees and costs, and such other and further relief as this Court deems fair and just under the circumstances, including but not limited to incidental and consequential damages.

Dated this 14th day of October, 2020.

Respectfully submitted,

*/s/ Justin K. Seigler*
Adam H. Fleischer (*pro hac vice*)
Justin K. Seigler (*pro hac vice*)
BATESCAREY LLP
191 North Wacker, Suite 2400
Chicago, Illinois  60606
Tel: (312) 762-3100
afleischer@batescarey.com
jseigler@batescarey.com

Kelly M. Lippincott
GORDON REES SCULLY MANSUKHANI
1101 King St., Suite 520
Alexandria, Virginia  22314
Tel: (703) 650-7015
klippincott@grsm.com

*Counsel for Plaintiff/Counter-Defendant*
*Rockhill Insurance Company*

2621201

## <u>CERTIFICATE OF SERVICE</u>

I, Justin K. Seigler, an attorney, hereby certify that on this 14th day of October, 2020, I served a copy of the foregoing Rockhill Insurance Company's Amended Complaint for Declaratory Judgment & Other Relief by filing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the following counsel of record:

Gerald Zingone
Michael S. McNamara
Clare Cavaliero Pincoski
Alex G. Anderson
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, D.C.  20036
Tel: (202) 663-8269
Fax: (202) 663-8007
gerald.zingone@pillsburylaw.com
michael.mcnamara@pillsburylaw.com
clare.pincoski@pillsburylaw.com
alex.anderson@pillsburylaw.com

John Jay Range
Wendell L. Taylor
Christopher J. Dufek
Bennett Sooy
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave., NW
Washington, D.C.  20037
Tel: (202) 955-1677
Fax: (202) 778-2201
jrange@huntonak.com
wtaylor@huntonak.com
cdufek@huntonak.com
bsooy@huntonak.com

*/s/ Justin K. Seigler*
Attorney for Plaintiff/Counter-Defendant
Rockhill Insurance Company